SAMUEL B. CROYLE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Croyle v. Commissioner
Docket No. 10979-79.
United States Tax Court
T.C. Memo 1980-501; 1980 Tax Ct. Memo LEXIS 85; 41 T.C.M. (CCH) 339; T.C.M. (RIA) 80501; November 6, 1980, Filed Fredric C. Jacobs, for the petitioner. sergio Garcia-Pages and Greely S. Curtis, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the year 1975 in the amount of $5,754.18.By an amendment to his answer in this case respondent increased the deficiency to $6,829.50 to reflect the fact that petitioner, who had filed his 1975 Federal income tax return as a single individual, was actually married at the close of the calendar year. The only issue presented for our decision is whether petitioner was a bona fide resident of France during 1975 and therefore entitled to the earned income exclusion provided by section 911(a)(1). [1]
*87 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioner is, and has always been, a citizen of the United States. He resided at 2233 Northwood Avenue, Easton, Pennsylvania, when he filed the petition in this case. He filed his 1975 Federal income tax return with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Petitioner is a pilot for Trans-World Airlines, Inc. (TWA) and has worked for the airline since 1956. Prior to September 1974 he was a resident of the United States.In the early part of September 1974 he permanently separated from his wife, Louise Croyle, and left the family home in Oldwick, New Jersey. He was divorced from Louise Croyle on October 29, 1976, and in accordance with the divorce decree he transferred to her his interest in the jointly owned family residence. From September 15, 1974 until September 1, 1976, petitioner rented, pursuant to a written lease agreement, an apartment in Paris, France which he shared with Ms. Renate Gahrns (hereinafter Ms. Gahrns). Petitioner had met Ms. Gahrns in 1968 *88 while she was working as a stewardess for TWA. Ms. Gahrns is a German citizen, fluent in English, who lived in Paris while employed by TWA. In October 1974 TWA closed its base for cabin attendants in Paris and consequently Ms. Gahrns became unemployed. She remained unemployed until September 1976, when she and petitioner moved to the United States. Petitioner paid all the expenses connected with the Paris apartment, including rent, utilities, and the premiums for a property and liability insurance policy on the apartment. He also spent approximately $3,500 to furnish it with various items purchased in Paris department stores. These furnishings included a sofa, beds, refrigerator, and stove. While he rented the Paris apartment petitioner flew as a copilot on a Boeing 747 jetliner in transatlantic flights from his base terminal at Kennedy International Airport (Kennedy) in New York primarily to Charles De Gaulle Airport (De Gaulle) in France, and then back to Kennedy. Petitioner commuted between Paris and New York on regularly scheduled TWA flights to start on his assigned flights or to return to Paris on completion of such flights. He would commute in this fashion without *89 charge by using either free pass privileges or special "additional crew member" privileges provided for off-duty TWA pilots. Petitioner flew approximately five assigned round-trip flights per month. Petitioner's routine of commuting from Paris to Kennedy to report for assigned flights required him to spend a certain amount of idle time in the United States. For example, petitioner would generally arrive in New York one day before his flight was scheduled to depart and would have to find temporary accommodations for the evening. Since his assigned flights were usually scheduled for take-off in the early evening, petitioner normally did not have to return to Kennedy until the late afternoon of the following day. Occasionally, if he had to fly two round-trip flights from Kennedy scheduled only a few days apart, petitioner would remain in the United States between flights in order to ease his commuting burden. From September 1974, when he separated from Louise Croyle, until December 1974, petitioner stayed at the Easton Hotel in Easton, Pennsylvania while waiting for flight duty at Kennedy. From January 1975 until September 1976 he stayed at the house of a friend, Sherman Tibbetts, *90 who also lived in Easton. For purposes of traveling to Easton, which was located about 100 miles from Kennedy, petitioner kept his personal automobile in the TWA parking lot at Kennedy and held a valid New Jersey driver's license while he was staying in Paris. Petitioner first met Mr. Tibbetts at the Harkers Hollow Golf Club in Phillipsburg, New Jersey in 1972. When Mr. Tibbetts became aware in the latter part of 1974 that petitioner was staying in the Easton Hotel while waiting to report for flight duty, he invited him to stay at his house in one of several unused bedrooms. Occasionally petitioner would eat dinner at Mr. Tibbetts' house. At all times he was treated as a guest and paid nothing for meals or lodging. He kept no personal effects or clothing in the house when he was not a guest there. During 1975 petitioner engaged in a number of activities while in the United States. Often he would play bridge with Mr. Tibbetts, and on Wednesday nights they would play at the Duplicate Bridge Club in Easton. Petitioner was also a member of the Harkers Hollow Golf Club, which was only a ten minute drive from Mr. Tibbetts' house. He was able to purchase a special nonresident *91 membership available at reduced rates to persons who lived more than 50 miles from the club.Petitioner would often stop by the club on the morning of a flight and hit a few golf balls, have lunch, shower and shave, and then change into his uniform before driving back to Kennedy in the afternoon. Approximately twice a month petitioner would stop on his way to Easton and visit with his children at the home of his estranged wife in Oldwick, New Jersey. He spent three days at Kennedy during 1975 receiving mandatory flight training. He also received three physical examinations, one required by TWA and two required by the Federal Aviation Administration, while in the United States. Petitioner decided to live in Paris for a number of reasons. One was his personal relationship with Ms. Gahrns. Another was that he enjoyed the Paris atmosphere. He also knew other TWA pilots who commuted from Paris and found it to be a relatively easy commute because the schedules between Kennedy and De Gaulle were particularly convenient for that purpose. In addition, petitioner's seniority among TWA international pilots allowed him to arrange his flight schedule so as to cluster his assigned flights, *92 thus leaving him large blocks of free time each month which he usually spent in Paris.Tax avoidance was a factor in his decision to move to Paris. Petitioner's apartment in Paris was located approximately fifteen miles away from De Gaulle. As a result, and because of the excellent public transportation in Paris, petitioner did not have a car or driver's license in France. With the exception of a few items stored at his house in Oldwick, New Jersey, and some other items which he kept in his hunting cabin in Pennsylvania, petitioner kept all his personal effects and clothing at the apartment. He also instructed TWA to send his company mail to that address. Petitioner did not maintain a bank account in Paris. He had his paychecks from TWA deposited in an account at a bank in Phillipsburg, New Jersey. He also kept a safe deposit box at that bank. While in Paris petitioner and Ms. Gahrns pursued a number of recreational activities. They socialized with both French and American friends, most of whom were TWA employees also living in Paris; they ate at restaurants frequently; and they often went dancing in the evenings at various Paris nightclubs. Occasionally petitioner would *93 accompany Ms. Gahrns to art exhibitions in the area. He purchased his clothing at Paris department stores and occasionally went grocery shopping with Ms. Gahrns at Paris markets. Although his knowledge of French was slight, he made no formal attempts to study the French language. In 1972 petitioner purchased for investment an undeveloped lot in Daytona Beach, Florida for $5,000. In October 1974 he purchased twelve acres of mountainside land in central Pennsylvania, approximately 185 miles from Easton, for $9,500. In November 1974 he purchased a trailer for $6,500 and installed it on the Pennsylvania property for use as a hunting cabin. The trailer was equipped with sewage, gas, and electric facilities. Petitioner has stayed at the trailer on hunting trips at least twice a year since 1974. Petitioner presently owns both the Florida and Pennsylvania properties. From 1970 to the present petitioner actively traded in investment securities in the United States. While in Paris petitioner would place buy and sell orders with his American broker by calling a special European telephone number. During 1975 petitioner owned three percent of the stock of Dataram, Inc., a New Jersey *94 corporation, for which he paid approximately $49,000. Petitioner took two vacations in 1975. In May he and Ms. Gahrns journeyed from their Paris apartment to Germany for two weeks to visit her family and thereafter they returned to Paris. In November petitioner stayed in the trailer on his Pennsylvania property for a week and hunted for deer and turkey with a longtime hunting companion. Following the hunting trip he returned to Europe and spent the second week of his vacation with Ms. Gahrns in Germany. In addition to these vacations, petitioner and Ms. Gahrns spent a week together in the United States in April 1975. Petitioner was present in France only 206 days during 1975. When petitioner moved to Paris he asked the local office of the Internal Revenue Service what was required in order to be considered a foreign resident for Federal income tax purposes. He also filed foreign residence affidavits with TWA which indicated that he was a resident of France and eligible for a partial exemption from Federal withholding taxes on his salary. Petitioner paid no income taxes to France in 1975 and made no inquiries as to whether he had an obligation to do so. He did not apply *95 for a French visa at any time during his stay in Paris. However, he did notify the officials at the American Embassy in Paris that he had leased an apartment and was living in Paris. Petitioner moved back to the United States in the fall of 1976 when he bid for and was awarded a position as a domestic pilot on Boeing 707 flights, and established his residence in Easton, Pennsylvania approximately thirty-five miles from his prior residence in Oldwick, New Jersey. Petitioner accepted the position because domestic pilots earn significantly more than international copilots. However, as a domestic pilot he enjoyed less seniority than he had as an international copilot and could not arrange his flight schedule as conveniently as before. Consequently, the shift to domestic flying made it impractical for him to continue commuting from Paris. Ms. Gahrns accompanied petitioner when he moved back to the United States and they were married in Maryland in November 1976, just a few days after petitioner received a divorce from his first wife. From September 1976 to November 1977 they lived in an apartment in Easton, Pennsylvania; thereafter they resided at petitioner's current address. *96 Petitioner intended to remain in France temporarily, rather than for an extended, yet indefinite, period. ULTIMATE FINDING OF FACT Petitioner was not a bona fide resident of France during 1975. OPINION Section 911(a)(1) provides that a citizen of the United States who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year may exclude from gross income earned income from sources without the United States attributable to such period, subject to certain limitations specified in section 911(c). The only issue for our decision is whether petitioner was a bona fide resident of France for an uninterrupted period spanning an entire taxable year and including all or a portion of the 1975 taxable year. [2]
*97 The determination of whether a citizen of the United States is a bona fide resident of a foreign country for purposes of section 911(a)(1) requires an analysis of all relevant facts and circumstances, applying, to the extent feasible, the principles of section 871 and the regulations thereunder which establish a test of residency for alien individuals in the United States. Schoneberger v. Commissioner, 74 T.C.     (August 7, 1980) (p. 13 of the slip opinion); Dawson v. Commissioner, 59 T.C. 264, 268 (1972); section 1.911-1(a)(2), Income Tax Regs. The principal distinction to be drawn is that of residents on the one hand, and transients or sojourners on the other. In this regard the intentions of the taxpayer respecting the nature and duration of his stay are of paramount importance. Dawson v. Commissioner, supra at 268; section 1.871-2(b), Income Tax Regs.[3] The regulations shed some light on the nature of the intent required. A United States citizen who intends to live in a foreign country indefinitely will be considered a resident. A floating intention to return to another country on some future date will not, by itself, classify *98 him as a transient. The regulations also provide that if a citizen travels to a foreign country to accomplish a specific purpose requiring an extended stay, he may qualify as a resident even though he intends to return to his domicile when his task is completed. It is clear that the citizen need not be domiciled in a foreign country, i.e., living there with the intent to make that country his permanent home, in order to be classed as a resident for Federal income tax purposes. Weible v. United States, 244 F.2d 158, 163 (9th Cir. 1957); Commissioner v. Swent, 155 F.2d 513, 515 (4th Cir. 1946), cert. denied, 329 U.S. 801 (1947). Schoneberger v. Commissioner, supra at     (p. 23 of the slip opinion); Dawson v. Commissioner, supra at 270. *99 On the other hand, it is equally clear that mere physical presence in a foreign country is not sufficient to establish bona fide residency. Downs v. Commissioner, 166 F.2d 504, 508 (9th Cir. 1948), cert. denied 334 U.S. 832 (1948); Constantinescu v. Commissioner, 11 T.C. 37, 43-44 (1948). The legislative history of section 911(a) and its predecessors supports this conclusion. Originally a United States citizen could avail himself of the earned income exclusion by establishing nonresidency in the United States. Section 116(a), Internal Revenue Code of 1939. In 1942 Congress changed the law to require the citizen claiming the exclusion to prove bona fide residency in a foreign country rather than nonresidency in the United States. Then in 1951 Congress, stating that stringent application of the bona fide residency test had worked a hardship on many individuals working overseas, enacted an alternative test which allowed the exclusion based on mere physical presence in a foreign country for a specified period of time. [4] However, it chose not to alleviate the strictness of the bona fide residency test. Thus, we *100 think the statutory history indicates that Congress expected the courts to strictly interpret the meaning of the term "bona fide resident," and physical presence in a foreign country, although obviously a factor to be considered, is by no means determinative.
We also note that in establishing bona fide residency the petitioner bears more than the usual burden of proof since section 911(a)(1) requires bona fide residency to be established "to the satisfaction of the Secretary or his delegate." We have recently held that such language requires the citizen to prove the merits of his claim by strong proof. Schoneberger v. Commissioner, supra at     (pp. 13-16 of the slip opinion). Bearing in mind the Congressional mandates of strict compliance and strong proof, we turn to the problem of determining petitioner's intentions with regard to the length of his stay. Since the taxpayer's professed intent is of little weight in such cases, we must rely primarily on an analysis of certain objective factors which the courts have found *101 to be relevant in past decisions. In Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), revg. 36 T.C. 131 (1961), the Court listed a number of factors [5] culled from prior case law which we subsequently accepted and applied in Dawson v. Commissioner, 59 T.C. at 268. See also Schoneberger v. Commissioner, 74 T.C. at     (p. 13 of the slip opinion). After applying those factors to the facts and circumstances of the present case, we find petitioner has failed to establish by strong proof that he was a bona fide resident of France during 1975. *102 We begin by noting that in Schoneberger this Court addressed the residency issue in a context nearly identical to that of the present case, i.e., a TWA pilot claiming residency in France and commuting from France to New York in order to fly primarily international flights between New York and Paris.There we observed that the taxpayer's employment situation was somewhat unusual for the following reasons (74 T.C. at    ) (pp. 16-17 of the slip opinion): His employment required that, wherever his residence was, he would spend substantial periods of time away from it. At the same time, it gave him special flexibility in choosing a place of residence because he was able to fly free of charge. Moreover, he was only on duty during certain periods of each month and, thus, had blocks of time when he did not have to be near his work base at JFK airport in New York. In addition, his employer had no objection to his residing in a country other than that in which he was based for employment purposes. Even though the taxpayer was frequently absent from France and his work base was in the United States, we held that he was a bona fide resident of France during a portion of the taxable *103 year in issue. Our conclusion was based primarily on the following facts: (1) the taxpayer was physically present in France whenever his employment did not require him to be elsewhere; (2) he did not have a place of abode in the United States; (3) his move to France was not motivated by tax-avoidance considerations; (4) he made efforts to become assimilated into the French environment, and (5) his testimony, coupled with other objective facts in the record, indicated that he intended to remain in France for an extended, yet indefinite, period. We felt, under these circumstances, that the petitioner had supplied the strong proof necessary to overrule respondent's determination. The present case is factually distinguishable from Schoneberger in several respects. First, the record does not reveal any meaningful efforts on the part of petitioner to become assimilated into the French environment. There is no evidence of any involvement by petitioner in any community activities, clubs, or organizations. He had no French bank accounts [6] or credit cards. Although his knowledge of French was slight, there is no evidence that he made any formal attempts to study the French language. *104 His contact with other French citizens was extremely limited. For the duration of his stay he shared his apartment with a former TWA stewardess who was a German citizen, fluent in English, and had lived in France for approximately eight years. Occasionally they socialized with a small number of French and American friends, but most of them were pilots or flight attendants employed by TWA and living in Paris. For these reasons we think petitioner tended to remain insulated from the mainstream of the French culture and its citizens. In our view the fact that petitioner and Ms. Gahrns frequently went to restaurants and nightclubs, and on occasion attended art exhibitions, does not, as petitioner suggests, evidence his assimilation into the surrounding environment; rather, it only serves to indicate the manner in which he chose to occupy his free time while in Paris. *105 We realize that assimilation into the foreign environment is not a prerequisite to attaining the status of bona fide residency. Nevertheless, evidence of assimilation is extremely important in foreign residency cases where reliable, objective evidence of the taxpayer's intentions with respect to the nature and duration of his stay is often difficult to come by. Since evidence of integration into the foreign society is highly probative of an intent to remain in the foreign country indefinitely, if not permanently, the courts have tended to place considerable reliance on such evidence. See, e.g., Schoneberger v. Commissioner, 74 T.C. at     (pp. 20, 24 of the slip opinion); Dawson v. Commissioner, 59 T.C. at 269; Benfer v. Commissioner, 45 T.C. 277, 292 (1965); Scott v. United States, 193 Ct. Cl. 27, 42, 432 F.2d 1388, 1397-1398 (1970). Second, we think an important distinguishing factor between Schoneberger and this case is the length of petitioner's stay in France. Unlike Schoneberger, where the pilot eventually married a French woman and was still living in Paris at the time he filed his petition with this Court, *106 the petitioner here returned to the United States in September 1976, just two years after he leased the Paris apartment. In our view continued residency in the foreign country for an extended period following the taxable year in issue is an appropriate factor to consider in evaluating the taxpayer's intentions with respect to that year. Since the petitioner left France after a relatively brief period, the reasons for his departure take on critical significance. Unfortunately for petitioner, the record is somewhat vague as to the circumstances which prompted his return to the United States. Petitioner testified that in the summer of 1976 his seniority among 747 international copilots was such that he was able to bid successfully for a position as a domestic captain on 707 flights. He sought the position because it would entitle him to a substantial increase in compensation. At the same time, however, his level of seniority among TWA domestic captains was such that he could not arrange his flight schedule as conveniently as he could previously, thus making it impractical for him to continue commuting from Paris to his home base at Kennedy. Accordingly, he found it necessary to *107 move back to the United States. [7]
The record does not reveal when petitioner formed his intention to bid for the domestic captain position. Nor are we told whether petitioner had any indication prior to 1976 as to when he would become eligible for such a position or when one would become available. Without such evidence we are unable to accept at face value petitioner's testimony that he intended to reside in France "indefinitely." It is entirely possible that petitioner knew he would be eligible for a domestic position in one or two years and intended all along to accept such a job if it became available, knowing full well that it would require him to resume his United States residency. Moreover, the circumstances *108 surrounding petitioner's marriage to Ms. Gahrns cast further doubt on his asserted intentions concerning the length of his stay. Both he and Ms. Gahrns testified that they believed that, because of immigration restrictions, she could not reside in the United States on a permanent basis unless she was married to petitioner. Petitioner obviously could not remarry until he had received a divorce from his first wife. He and Ms. Gahrns moved to the United States in September 1976; he was granted a divorce from Louise Croyle in October 1976; and he was married to Ms. Gahrns in November 1976. This sequence of events, coupled with Ms. Gahrns' testimony that she was anxious to move to the United States after living in Paris for so many years and the fact that she remained unemployed after her lay-off in October 1974, suggest the possibility that petitioner intended to remain in France only temporarily, perhaps until his divorce was finalized, and thereafter marry Ms. Gahrns and return to the United States. In the absence of any evidence indicating precisely when the couple decided to get married, we are unwilling to dismiss our doubts concerning petitioner's intentions as mere speculation, *109 particularly in view of the burden of strong proof which petitioner bears in this case. Furthermore, we are not convinced, as we were in Schoneberger, that tax avoidance considerations did not play a role in petitioner's decision to move to Paris. The record indicates that shortly after he moved to Paris he consulted with the local office of the Internal Revenue Service regarding the requirements for claiming the foreign residency exclusion. He also filed foreign residence affidavits with TWA in order to claim an exemption from Federal withholding taxes. Although petitioner clearly had other reasons for living in Paris, we think, notwithstanding his testimony to the contrary, that his decision to relocate was influenced to some degree by the prospect of avoiding both United States and French income taxes on a substantial portion of his earned income. We also find it significant that, although petitioner allegedly intended to remain in France indefinitely, at no time did he apply for a temporary or permanent French visa. In Schoneberger we were confronted with a similar situation and respondent argued, based on the last sentence of section 1.871-2(b), Income Tax Regs. *110 , [8] that the taxpayer was not a resident of France since French immigration law limited his stay to 90 days without a visa. However, the law permitted him to remain in France indefinitely if he left and re-entered the country once every 90 days, so long as this was not done solely to circumvent the visa requirements. Because the taxpayer's job as an international pilot required him to leave France frequently in any 90-day period, we concluded that the immigration laws imposed only nominal restrictions on his stay. Further, we noted that he had consulted a French attorney on this matter and was informed that no visa was required in his situation. Thus, we found in Schoneberger that there were "exceptional circumstances" present which rendered the last sentence of the regulations inapplicable. By contrast, the petitioner in the present case did not consult an attorney about the visa requirements. He testified that he informed the *111 officials at the American Embassy in Paris that he had leased an apartment in Paris; however, he apparently did not ask whether a visa was required nor did he inform the officials of his intentions with regard to the length of his stay. Although we believe that petitioner's employment situation automatically creates the exceptional circumstances required by the regulation, [9] we still think his failure to make reasonable inquiries concerning his obligations under the immigration laws is at odds with his stated intention to remain in France indefinitely. There are other facts which further undermine petitioner's asserted *112 status as a bona fide resident of France during 1975. His employment was based in the United States, not France. He paid no income taxes to the French government. [10] He was physically present in France only 206 days during 1975. [11] Moreover, unlike the taxpayer in Schoneberger, petitioner continued to maintain rather extensive ties with the United States during his stay in France. The five children of his first marriage continued to live in the United States, the younger children living with Louise Croyle in Oldwick, New Jersey. Petitioner visited his children approximately twice a month. While waiting to report for flight duty at Kennedy during 1975 he did not stay in a hotel, as did the taxpayer in Schoneberger; instead, he occupied a spare bedroom in the house of a friend, Sherman Tibbetts, who lived in Easton, Pennsylvania, approximately 100 miles away from Kennedy airport. He often played bridge with Mr. Tibbetts, and on Wednesday nights he would play at the Duplicate Bridge Club in Easton. He was a member of the Harkers Hollow Golf Club in Easton and used the club facilities frequently while in the United States. For purposes of traveling to and from Easton *113 petitioner kept his automobile in the TWA parking lot at Kennedy and continued to hold a New Jersey driver's license. He maintained a safe deposit box and a checking account at a bank in Phillipsburg, New Jersey, where his TWA paychecks were deposited. During 1975 petitioner also owned two parcels of land, one in Florida and one in Pennsylvania. Although his ownership of land in the United States is not by itself significant, we do find it significant that in November 1974, two months after he leased the Paris apartment, petitioner purchased a trailer for $6,500 and installed it on the Pennsylvania property for use as a hunting cabin. Petitioner stayed in the trailer for a week during his vacation in November 1975, and since that time he has used it at least twice a year while on hunting trips. All of these facts, when considered in the aggregate and in conjunction with the other matters previously considered in this opinion, support respondent's contention that petitioner assumed the status of a transient or sojourner, rather than a bona fide resident, during his stay in France. Moreover, we note that when petitioner returned to live in the United States, he established his *114 residence in Easton, Pennsylvania, the place where he had continuing contacts during his sojourn abroad and which was in close proximity to the area where he had previously lived. *115 Accordingly, we hold on these facts that petitioner has failed to establish by strong proof that he was a bona fide resident of France during 1975. Therefore, he is not entitled to the earned income exclusion provided in section 911(a)(1). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year at issue, unless otherwise indicated. For taxable years beginning after December 31, 1978, (see Pub. L. 95-615, secs. 209(a) and (c), 92 Stat. 3097, 3109 (1978)), section 911(a) has been limited in its application to individuals residing in camps located in hardship areas. Pub. L. 95-615, supra,↩ sec. 202(a), 92 Stat. at 3098.
2. Petitioner concedes that he cannot satisfy the alternative test of section 911(a)(2), which allows an exclusion if the taxpayer is present in a foreign country for at least 510 days during a period of 18 consecutive months. Respondent concedes that if petitioner is found to have been a resident of France during all of 1975, he is entitled to the maximum exclusion provided in section 911(c)(1)(A), or $20,000.↩
3. Sec. 1.871-2(b), Income Tax Regs., provides as follows: RESIDENCE DEFINED. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.↩
4. See S. Rept. No. 781, 82d Cong., 1st Sess., p. 53 (1951), 1951-2 C.B. 458↩, pertaining to the forerunner of section 911(a)(2).
5. The Court stated as follows (300 F.2d at 38): Among the factors considered by the courts in determining whether a citizen of the United States has discharged his burden of satisfactorily establishing his claim of bona fide residence in a foreign country during an entire taxable year are the following: (1) intention of the taxpayer; (2) establishment of his home temporarily in the foreign country for an indefinite period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with his employment; (5) nature, extent and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; (11) good faith in making his trip abroad; whether for purpose of tax evasion. While all such factors may not be present in every situation, those appropriate should be properly considered and weighed.↩
6. Petitioner testified that he attempted to open an account at a French bank but was rejected because he was not a citizen of a member nation of the European Economic Community. Regardless of whether we accept petitioner's testimony on this point, we are not convinced that his United States citizenship precluded him from using the services of other banks in Paris.↩
7. Although the stipulation indicates that petitioner moved back to the United States in September 1976, he testified that he was awarded the domestic position on October 1, 1976. This would appear to contradict his assertion that his new job was the reason for his return. However, we think it reasonable to assume, given his testimony, that when he returned to the United States he had already received informal assurances that he would be awarded the position.↩
8. That sentence states: "An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances."↩
9. In Schoneberger the parties stipulated to all relevant matters of French law, including immigration restrictions, and we relied on the law as stipulated for purposes of our opinion. In the present case the parties have not stipulated to these matters. Nevertheless, no evidence has been introduced, either at trial or on brief, which would suggest an interpretation of the immigration laws contrary to that set forth in Schoneberger↩ and therefore we feel justified in relying on the stipulated matters and our analysis thereof for purposes of this case.
10. We assume, as respondent did on brief, that petitioner was not required to pay any French income taxes during 1975 under Article 15 of the United States--France Income Tax Convention, [1968] 19 U.S.T. 5280, T.I.A.S. No. 6518, also reprinted at 1968-2 C.B. 691. Nevertheless, the absence of a foreign income tax obligation, while not dispositive, is an appropriate factor to be weighed in deciding the issue of bona fide residency. Sochurek v. Commissioner, 300 F.2d at 38; Schoneberger v. Commissioner, 74 T.C. at     (p. 23 of the slip opinion); Scott v. United States, 193 Ct. Cl. 27, 38, 432 F.2d 1388, 1394↩ (1970). 11. Petitioner testified that he was in France approximately 260 days during 1975. Ms. Gahrns testified that she thought he was there at least 200 days. Respondent maintains, based on an analysis of petitioner's flight log and other facts in the record pertaining to petitioner's vacations, that petitioner was present approximately 206 days. We think respondent's estimate, and the assumptions on which it is based, are reasonable and we adopt it as a finding of fact herein.↩