PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2318, 11-2319, 11-2320, 11-2321, 11-2322,
11-2603, 11-2618, 11-2619, 11-2620, 11-2621, 11-2622, 11-2623,
11-2624, 11-2625, 12-1416 and 12-1417
_____


GAIL VENTO,
Appellant in 11-2318

RICHARD VENTO,
Appellant in 11-2319

RENEE VENTO,
Appellant in 11-2320

NICOLE MOLLISON,
Appellant in 11-2321

LANA VENTO,
Appellant in 11-2322

VI DERIVATIVES LLC BY VIFX LLC ITS TAX
MATTERS PARTNER
BY RICHARD G. VENTO ITS TAX MATTER PARTNER,
Appellant in 12-1416

VIFX BY RICHARD G. VENTO ITS TAX MATTER
PARTNER,
                    Appellant in 12-1417


v.


DIRECTOR OF VIRGIN ISLANDS BUREAU OF
INTERNAL REVENUE
                              Appellant in
                              11-2603 and
                              11-2618
                         through 11-2625


UNITED STATES OF AMERICA,
                    Intervenor-Defendant-Appellee



(D.C. V.I. No. 3-06-cv-00003, 04, 05,  06,
07, 08, 09, 10, 12, 13)

_____


On Appeal from the District Court
of the Virgin Islands
(D.C. No. 06-cv-0006)
District Judge:  Honorable Juan R. Sanchez

_____


Argued December 5, 2012
Before:  SMITH, HARDIMAN and ROTH, *Circuit Judges*.

(Filed: April 17, 2013)

Robert L. Byer, Esq.
Susan G. Schwochau, Esq.
Duane Morris
600 Grant Street
Suite 5010
Pittsburgh, PA 15219

Nathan Z. Dershowitz, Esq. [ARGUED]
Victoria B. Eiger, Esq.
Dershowitz, Eiger & Adelson
220 Fifth Avenue
Suite 300
New York, NY 10001

Joseph M. Erwin, Esq.
Suite 700
100 Crescent Court
Dallas, TX 75201

Robert M. Palumbos, Esq.
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103

     *Attorneys for Appellants Gail Vento, Richard Vento,*
     *Renee Vento, Nicole Mollison and Lana Vento*

Jennifer M. Rubin, Esq. [ARGUED]
Kenneth L. Greene, Esq.

United States Department of Justice
Tax Division
P.O. Box 227
Ben Franklin Station
Washington, DC 20044-0000

   *Attorneys for Appellee United States of America*

Tiffany V. Monrose, Esq.
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade, GERS Complex, 2nd Floor
St. Thomas, VI 00802

Gene C. Schaerr, Esq. [ARGUED]
Winston & Strawn
1700 K Street, N.W.
Washington, DC 20006-0000
   *Attorneys for Appellee Director of Virgin Islands
   Bureau of Internal Revenue*

_____

## OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

These consolidated appeals are of great importance to the tax regimes of the United States and the U.S. Virgin Islands. Residents of the Virgin Islands pay income taxes to the Virgin Islands Bureau of Internal Revenue (VIBIR) rather

than the Internal Revenue Service (IRS). Appellants Richard and Lana Vento (the Ventos) filed a joint 2001 income tax return with the VIBIR. Their three daughters also filed their 2001 income tax returns with the VIBIR. The United States claims that the Ventos and their daughters (collectively, Taxpayers) should have filed those returns with the IRS instead. The proper tax jurisdiction depends on whether the Taxpayers were bona fide residents of the Virgin Islands as of December 31, 2001.

I

A successful entrepreneur, Richard Vento co-founded a technology company called Objective Systems Integrators, Inc. (OSI). When OSI was sold, the Ventos, their daughters, and various Vento-controlled entities realized $180 million in capital gains for the 2001 tax year. Not surprisingly, this boon caused the Ventos to consult a financial professional to advise them regarding their capital gains.

Whatever advice the Ventos received and however they acted upon it, the Taxpayers have become embroiled in numerous tax disputes in various courts.[1] The dispute at issue

---

[1] *See, e.g.*, *Mollison v. United States*, 568 F.3d 1073 (9th Cir. 2009); *Mollison v. United States*, 481 F.3d 119 (2d Cir. 2007); *Richard Vento v. Comm'r*, No. 18741-08 (Tax Ct. Sept. 18, 2012) (stipulated decision); *Lana Vento v. Comm'r*, No. 18742-08 (Tax Ct. Sept. 18, 2012) (stipulated decision); *DTLV, LLC v. Comm'r*, No. 742-09 (Tax Ct. filed Jan. 8, 2009); *DTDV, LLC v. Comm'r*, No. 741-09 (Tax Ct. filed Jan. 8, 2009); *Gail Vento v. Comm'r*, No. 23527-08 (Tax Ct. filed Sept. 24, 2008); *Renee Vento v. Comm'r*, 23540-08 (Tax Ct. filed Sept. 24, 2008); *Mollison v. Comm'r*, No. 23600-08

in the consolidated appeals now before us began in 2005, when the VIBIR issued Notices of Deficiency and Final Partnership Administrative Adjustments (FPAAs) to the Taxpayers and partnerships they controlled, assessing a deficiency and penalties of over $31 million against the Ventos and approximately $6.3 million against each of their three daughters. The VIBIR also concluded that two Vento-owned partnerships, VI Derivatives, LLC and VIFX, LLC,[2] were shams and disregarded them for tax purposes.

That same year, the IRS issued FPAAs to the Taxpayers that were nearly identical to those issued by the VIBIR. Significantly, however, the IRS issued FPAAs to two other Vento-controlled partnerships—DTDV, LLC and

---

(Tax Ct. filed Sept. 24, 2008); *Richard Vento v. Comm'r*, No. 18740-08 (Tax Ct. filed July 31, 2008); *Lana Vento v. Comm'r*, No. 18739-08 (Tax Ct. filed July 31, 2008); *Gail Vento v. Comm'r*, No. 993-06 (Tax Ct. filed Jan. 12, 2006); *Renee Vento v. Comm'r*, No. 992-06 (Tax Ct. filed Jan. 12, 2006); *Lana Vento v. Comm'r*, No. 991-06 (Tax Ct. filed Jan. 12, 2006); *Richard Vento v. Comm'r*, No. 990-06 (Tax Ct. filed Jan. 12, 2006). Several of these cases remain inactive pending our decision in this case.

[2] Unless they elect to be treated as corporations, limited liability companies are treated as partnerships for tax purposes. *See* 26 U.S.C. §§ 702, 761(a); *Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 429 n.1 (3d Cir. 2012). For the sake of simplicity, we will refer to the Vento LLCs subject to FPAAs as partnerships.

6

DTLV, LLC—that were unchallenged by the VIBIR.[3] Consequently, the IRS assessed deficiencies and penalties against the Taxpayers that totaled over $9 million more than those assessed by the VIBIR.

The Taxpayers challenged the VIBIR's and IRS's Notices of Deficiency and FPAAs in several separate proceedings in the District Court of the Virgin Islands. The United States moved to intervene in the cases between the Taxpayers and the VIBIR, arguing that the Taxpayers should have filed and paid their 2001 taxes to the IRS instead of the VIBIR because they were not bona fide residents of the Virgin Islands.[4] Following the intervention of the United States, the cases were consolidated in the District Court, which had subject matter jurisdiction under 48 U.S.C. § 1612(a).

In June 2010, the District Court conducted a bench trial. The sole issue at trial was whether the Taxpayers were bona fide residents of the Virgin Islands as of December 31, 2001. The District Court held that they were not, and the Taxpayers, joined by the VIBIR, appealed. We have

---

[3] These two FPAAs are the subject of litigation in the U.S. Tax Court that has remained dormant since August 2012. *See DTLV, LLC v. Comm'r*, No. 742-09 (Tax Ct. filed Jan. 8, 2009); *DTDV, LLC v. Comm'r*, No. 741-09 (Tax Ct. filed Jan. 8, 2009).

[4] Except where otherwise indicated, "Virgin Islands" refers only to the United States Virgin Islands.

7

appellate jurisdiction over the consolidated appeals under 28 U.S.C § 1291.[5]

## II

The parties largely agree on the facts and the governing law. Their arguments revolve around a few disputed facts and their competing applications of the law to the facts. Our review of the facts adopts those found by the District Court, except where we indicate otherwise.

## A

Richard and Lana Vento are married and filed a joint 2001 tax return. From 1995 through 2000, the Ventos lived in Incline Village, Nevada, on the north shore of Lake Tahoe. That home was fully furnished and contained more than $500,000 worth of artwork. In 2000 and 2001, the Ventos also owned two homes in Hawaii, two homes on the south shore of Lake Tahoe in California, and a condominium in Utah. The Ventos kept approximately twenty automobiles in Nevada and California.

The Ventos have three daughters, all of whom were adults in 2001. In early 2001, the Ventos' eldest daughter, Nicole Mollison, lived in a separate home in Incline Village

---

[5] The VIBIR attempted to appeal the final order filed in the litigation between VI Derivatives, LLC and the United States, No. 3:06-cv-00012. Although the VIBIR was not a party to that case, VI Derivatives, LLC also appealed the final order, and its appeal is the basis of our jurisdiction under 28 U.S.C. § 1291.

with her husband and three children. The Ventos' second child, Gail, lived in Boulder, Colorado, while their youngest daughter, Renee, lived in San Diego, California. The Ventos also maintained a family office in Incline Village.

After the sale of OSI, the Ventos and their daughters took a family vacation in March 2001 during which they chartered a yacht and visited approximately ten of the British and U.S. Virgin Islands. Prior to this trip, no member of the Vento family had ever been to the Virgin Islands or considered moving there.

Soon after cruising the islands, the Ventos began searching for residential property in the Virgin Islands. Their daughters were not involved in the search. In May 2001, the Ventos (through a limited liability company they controlled) contracted to buy Estate Frydendahl, a residential property on St. Thomas, for $7.2 million. Estate Frydendahl—which included a five-bedroom main house and several outlying buildings, including three two-bedroom cottages with kitchens—was sold furnished, and the transaction closed on August 1, 2001. At the time of purchase, the sellers were living in some of the outlying buildings, but the main house was vacant.

Once the Ventos had Estate Frydendahl under contract, they hired professional home inspector Adrian Bishop to inspect the property. Bishop's report concluded that Estate Frydendahl was a "magnificent house and property," and was "substantially built, but . . . suffering from deferred maintenance." Bishop summarized his findings:

> There are no major structural deficiencies on the property. There are some places where

> deficiencies exist, and all the structures suffer from deferred maintenance to varying degrees. The electrical system has many deficiencies, the plumbing system is quite sophisticated but suffering from 46 (or so) years of existence, and the roofs are in various states of repair.

Based on Bishop's report, the Ventos' attorney concluded that there were "$50,000 to $64,000 worth of items which . . . should be addressed immediately upon closing." Most of that sum was attributable to repairs to the roofs, gutters, and electrical system. As a result of Bishop's report, the purchase price of Estate Frydendahl was reduced to $6.75 million.

In addition to the repairs recommended by Bishop, the Ventos desired other significant improvements to Estate Frydendahl. At trial, Richard testified that, although his wife wanted to keep "the rock walls and the lignum vitae floor," they "had to redo all the rest of it" including the "roof, . . . air conditioning, electricity, plumbing. Everything." The Ventos ultimately spent more than $20 million over and above the original purchase price improving Estate Frydendahl.

In November 2001, Richard retained a general contractor, RR Caribbean, Inc., to make improvements. However, their agreement did not specify any particular work to be done. Rather, it merely created "a baseline contractual relationship." The November agreement had an initial term of two years and would renew annually unless either party cancelled it in writing. RR Caribbean performed "some minor construction work" in 2001, but major work did not begin until 2002.

10

The Ventos hoped that renovations to Estate Frydendahl could be completed in time for them to move in by Christmas 2001. Progress was slow, however, and the Ventos grew frustrated. Consequently, in the late fall of 2001, Lana Vento brought in Dave Thomas, a construction manager whom she had previously hired to work in Hawaii, to supervise the project. In December 2001, Thomas travelled to the Virgin Islands and concluded that the main house at Estate Frydendahl was "50 percent livable, where you could live there. But the normal amenities did not work properly or consistently, including water, electricity." In particular, Thomas testified that, although the main house "was livable, to the point where you had electricity, lights, stove," the entrance gate did not work, the house was very warm because the ceiling fans and air conditioning did not work, the dock was dilapidated and very dangerous, there was no source of potable water because the water purification system did not work, some of the toilets did not work, and the power supply was inadequate. Thomas also testified that the three outlying cottages were "pretty much, flat out" unlivable. Thomas began working on improving Estate Frydendahl in January 2002. He stayed there until "Christmas of 2003," at which point the Ventos "had their whole family and friends" there and "had things up and running." Nevertheless, work on Estate Frydendahl continued for six more years.

In August 2001, the Ventos began planning a Christmas party at Estate Frydendahl. Lana furnished certain rooms and ordered a pool table. She also hired a designer to decorate both the Estate and her Incline Village house for Christmas. For the Christmas party itself, the Ventos invited seventeen family members to Estate Frydendahl. They also paid for Lana's brother, Raleigh Pribanich, and his family to

11

fly from California to St. Thomas. Between December 25, 2001, and January 1, 2002, Pribanich took many photographs of the Vento family members and their guests.[6] Following the Christmas party, the Ventos' designer took down the decorations and moved the furniture from the main house to one of the cottages.

Although Nicole Mollison returned to Nevada with her husband and children on December 26, 2001, the other Vento family members and guests stayed on St. Thomas through New Year's Eve. Afterwards, the Ventos began to split their time between the Virgin Islands and the mainland. Lana visited the Virgin Islands most frequently because she was overseeing the construction efforts at Estate Frydendahl. She would spend between one and six weeks at a time there, then leave for another six weeks. During the first five months of 2002, Richard spent 35 days in St. Thomas, 23 days in San Francisco, and 41 days in Nevada. Richard also spent considerable time in Hawaii in 2002. He filed his 2001 tax return from Hawaii and requested Honolulu as the place of trial in a separate legal dispute with the IRS.

In addition to purchasing Estate Frydendahl, Richard became interested in participating in the Virgin Islands's Economic Development Program (EDP), which offers very favorable tax treatment to certain approved Virgin Islands companies. *See* 29 V.I.C. § 713b. Richard received financial

---

[6] Because of the financial ties between the Ventos and the Pribanichs and the circumstances surrounding the photographs, the District Court concluded that several of them were taken for the purpose of portraying the Ventos as Virgin Islands residents.

and legal advice regarding the EDP and, between May 2001 and August 2001, he founded three companies in the Virgin Islands: (1) Virgin Islands Microsystems, which was to perform nanotechnology research; (2) Edge Access, which was to build internet access devices; and (3) VI Derivatives, LLC, which the VIBIR and IRS later deemed a sham partnership. Ultimately, only Virgin Islands Microsystems was approved to receive EDP benefits, and that approval did not occur until 2002.

The Ventos obtained Virgin Islands driver's licenses and registered to vote there in the fall of 2001. However, they moved none of their art collection and "very little" of their personal property to St. Thomas. Nor did the Ventos maintain a post office box in St. Thomas, despite the fact that mail service was unavailable at Estate Frydendahl. The Ventos did, however, create a post office box for their business, which they listed as their billing address when they set up utilities at Estate Frydendahl.

Throughout the early 2000s, the Ventos also engaged in real estate transactions on the mainland. In October 2000, they listed the Incline Village house for sale, contingent upon their purchase of a 2.2-acre property containing an old cottage on the north shore of Lake Tahoe. In May 2001, the Ventos purchased that Lake Tahoe property for $13.5 million. They planned to build a new home containing a 22-car garage and a tennis court there, but that plan was ultimately abandoned in 2007.

As of December 2001, the Ventos had not sold the Incline Village house. They calculated that they would save money by donating the house to charity and utilizing the tax deduction, rather than selling it. Consequently, on December

13

28, 2001, the Ventos purported to donate the Incline Village house by quitclaim deed to the Dick & Lana Charitable Support Organization (Support Organization), a Virgin Islands organization.[7]

The Ventos purchased an insurance policy in their names on the Incline Village house for calendar years 2001 and 2002, and more than $3 million of their personal property remained there. The Incline Village house was finally sold in March 2002.

In April 2002, the Ventos purchased a furnished two-bedroom condominium in Incline Village. They purchased it in the name of the Support Organization and then leased it to themselves for $3,500 per month for three years, though they paid no rent for the first four months of the lease term. In April 2002, the Support Organization held a meeting, the minutes of which stated: "Will live in the Condo until the new house is built." The District Court interpreted that line to mean that the Ventos would live in the Incline Village condominium until the planned Lake Tahoe house was built.

B

As of December 31, 2001, the three Vento daughters were all adults. The eldest, Nicole, was at all relevant times

---

[7] At the time of this purported donation, the Support Organization did not actually exist because its formation documents were not signed until March 2002. The legitimacy of the donation is currently the subject of other litigation between the Ventos and the IRS. *See Richard Vento v. Comm'r*, No. 990-06 (Tax Ct. filed Jan. 12, 2006).

married to Peter Mollison. In 2001, Nicole and Peter were the parents of three children, though they adopted a fourth child in 2003. In 1995, the Mollisons moved into a home in Nevada that was titled to Nicole Vento, LLC. They hired contractors to remodel that home during 2000, 2001, and 2002. In 2006, the Mollisons moved to a new home in San Anselmo, California, where they were living as of February 2011.

In 2001, the Mollisons visited St. Thomas three times, each time staying at Estate Frydendahl and engaging "in tourist activities." The Mollisons never moved any of their pets or personal property to St. Thomas. Nicole never obtained a Virgin Islands driver's license or voter registration. She listed her address on her 2001 tax return as a mail drop in St. Thomas. Although Nicole testified that she moved into a two-room suite at Estate Frydendahl, the District Court found her testimony "not credible given her evasive demeanor on cross-examination, her family's continuing ties to Nevada . . . , and the lack of safe and comfortable accommodations for the Mollison family at [Estate Frydendahl]."

In 2003, Nicole studied to become a teacher at Sierra Nevada College in Incline Village, Nevada. She eventually became licensed to teach in Nevada and California, but not in the Virgin Islands. From 2000 through the 2005–06 school year, all of Nicole's children attended school in Nevada, although they were enrolled in a St. Thomas school for a few weeks in 2004. During their 2003 adoption proceedings, the Mollisons swore under oath that they were residents of Washoe County, Nevada. Nicole did not tell the Nevada court or social worker that she had a Virgin Islands residence.

The Ventos' second daughter, Gail, was enrolled as a full-time student at the University of Colorado at Boulder from 1998 until December 2002. In 2000, Gail bought a 2,800-square foot house in Boulder, where she lived with her boyfriend, Eric Walker, for the remainder of her college career. Gail visited St. Thomas twice in 2001—for the family cruise in March and for the Christmas party—during which she stayed in a bedroom in the main house at Estate Frydendahl and engaged in "tourist-type activities." Other than some clothing, Gail brought no personal property to St. Thomas.

By the end of 2001, Gail had neither obtained a Virgin Islands driver's license nor registered to vote there. In May 2003, Gail purchased a house in Nevada. In September of that year, she and Eric Walker married. Following their marriage, they moved into one of the cottages at Estate Frydendahl, where they lived until they moved into a new home on St. Thomas in 2008. At trial, Gail testified that she moved to the Virgin Islands in 2002.

The youngest Vento daughter, Renee, graduated from San Diego State University in June 2001. After graduation, she took a trip to the Virgin Islands and stayed at a hotel on St. Thomas. Renee traveled again to St. Thomas in September 2001, when she stayed in a room in the main house at Estate Frydendahl. She also traveled to St. Thomas for the Christmas party, but returned to Nevada in early January 2002. The only personal property Renee had in St. Thomas were "easily movable items," such as clothing, camera equipment, and a laptop.

At the end of 2001, Renee had neither obtained a Virgin Islands driver's license nor registered to vote there.

She obtained a Virgin Islands driver's license in March 2002 but kept her Nevada license as well. At some point, Renee lost her Virgin Islands driver's license but did not replace it. In 2005, she renewed her Nevada driver's license. Renee never opened a bank account in the Virgin Islands.

From summer 2001 until spring 2002, Renee lived at Lake Tahoe and was employed in her family's home office, for which she was paid around $14 per hour to perform administrative tasks. In January 2002, Renee applied to the Brooks Institute of Photography in California, listing her address as a post office box in Nevada. She enrolled at the Brooks Institute in 2002 and lived in California.

## III

Having described the procedural history and facts of these appeals, we turn to the applicable law. Our exposition begins with an overview of the special relationship between the Virgin Islands and the United States.

## A

The United States acquired the Virgin Islands from the King of Denmark in 1916. *See* 48 U.S.C. § 1541. After the acquisition, the local tax laws remained in force until Congress enacted the Naval Service Appropriations Act of 1921, currently codified at 48 U.S.C. § 1397. *See Bizcap, Inc. v. Olive*, 892 F.2d 1163, 1165 (3d Cir. 1989) (reviewing history). That statute provides:

> The income-tax laws in force in the United States of America and those which may hereafter be enacted shall be held to be likewise

17

in force in the Virgin Islands of the United
States, except that the proceeds of such taxes
shall be paid into the treasuries of said islands.

48 U.S.C. § 1397. This statutory scheme is known as the "mirror code," under which the Internal Revenue Code is applied to the Virgin Islands merely by substituting "Virgin Islands" for "United States" throughout. *See Bizcap*, 892 F.2d at 1165; *Chicago Bridge & Iron Co. v. Wheatley*, 430 F.2d 973, 975 & n.3 (3d Cir. 1970).

According to this statutory scheme, Virgin Islands residents are subject to different tax filing requirements than other United States citizens. Under the version of 26 U.S.C. § 932(c) applicable in these appeals, taxpayers who are "bona fide resident[s] of the Virgin Islands at the close of the taxable year"[8] are required to "file an income tax return for the taxable year with the Virgin Islands." 26 U.S.C. § 932(c) (1986). If the taxpayer "on his return of income tax to the Virgin Islands, reports income from all sources and identifies the source of each item shown on such return" and "fully pays his tax liability . . . to the Virgin Islands with respect to such income," then "for purposes of calculating income tax liability to the United States, gross income shall not include any amount included in gross income on such return." 26 U.S.C. § 932(c)(4). Thus, bona fide Virgin Islands residents who fully report their income and satisfy their obligations to

---

[8] In 2004, § 932(c) was amended to require taxpayers to be "bona fide resident[s] of the Virgin Islands during the entire taxable year." 26 U.S.C. § 932(c)(4)(A) (2004). That amendment does not apply to these appeals because it was not retroactive.

the VIBIR do not pay taxes to the IRS.  *See Abramson Enters., Inc. v. Gov't of Virgin Islands*, 994 F.2d 140, 144 (3d Cir. 1993).  This is true even if the bona fide Virgin Islands resident is also a resident of the mainland United States.  As we will discuss later, taxpayers may have multiple residencies, and § 932(c) requires only that taxpayers have a bona fide residency in the Virgin Islands, not that they lack bona fide residencies elsewhere.

Although Virgin Islands residents who satisfy the requirements of § 932(c) pay their taxes to the VIBIR rather than the IRS, the Virgin Islands's ability to engage in tax competition with the United States is limited by 26 U.S.C. § 934, which provides that "[t]ax liability incurred to the Virgin Islands pursuant to [the mirror code] . . . shall not be reduced or remitted in any way, directly or indirectly, whether by grant, subsidy, or other similar payment, by any law enacted in the Virgin Islands, except to the extent provided in subsection (b)."  26 U.S.C. § 934(a).[9]  Subsection (b), in turn, provides a limited exception for Virgin Islands residents' tax liability "attributable to income derived from sources within the Virgin Islands or income effectively connected with the conduct of a trade or business within the Virgin Islands."  26 U.S.C. § 934(b).  Thus, Virgin Islands residents pay the same taxes at the same rates on their non-Virgin Islands-source income as non-Virgin Islands residents, though the taxes on Virgin Islands-source income may differ.  *See United States*

---

[9] 26 U.S.C. § 934 was cosmetically amended in 2004.  *Compare* 26 U.S.C. § 934(b)(4) (1986), *with* 26 U.S.C. § 934(b)(4) (2004).  Because the 2004 amendments are not retroactive, the 1986 version of § 934 applies in this case.

19

*v. Auffenberg*, 2008 WL 4115997, at *2 (D.V.I. Aug. 26, 2008).

As authorized by 26 U.S.C. § 934(b), the Virgin Islands enacted the Economic Development Program to promote local economic activity. Pursuant to the EDP, bona fide residents of the Virgin Islands can receive a 90% tax reduction on certain approved Virgin Islands-source income. *See* 29 V.I.C. § 708(b) (bona fide residency requirement); 29 V.I.C. § 713b (income tax reduction).

B

The meaning of residency "may vary according to context." *Martinez v. Bynum*, 461 U.S. 321, 330 (1983). In the tax context, residency requires "far less than domicile." *Sochurek v. Comm'r*, 300 F.2d 34, 38 (7th Cir. 1962); *see also Croyle v. Comm'r*, 41 T.C.M. (CCH) 339 (1980) ("[T]he citizen need not be domiciled in a foreign country . . . in order to be classed as a resident for Federal income tax purposes."). Unlike domicile, residency does not require "an intent to make a fixed and permanent home."[10] *Sochurek*, 300 F.2d at

---

[10] "'[R]esidence' generally requires both physical presence and an intention to remain." *Martinez*, 461 U.S. at 330. In the tax context, however, although courts consider intent as a factor in determining residency, they are divided over whether intent is absolutely required for residency. *Compare Weible v. United States*, 244 F.2d 158, 163 (9th Cir. 1957) ("'Residence' simply requires bodily presence as an inhabitant in a given place."), *with Bergersen v. Comm'r*, 109 F.3d 56, 61 (1st Cir. 1997) ("'[R]esidence' implies that the individual has established his or her residential base, planning to remain indefinitely or at least for a substantial period."). In

20

38. Furthermore, while a person can have only one domicile, he can be a resident of multiple places at the same time. *See Downs v. Comm'r*, 166 F.2d 504, 508 (9th Cir. 1948); *see also Martinez*, 461 U.S. at 339–40 (Marshall, J., dissenting) (noting the rule that an individual can have "but one domicile and several residences"); *Hill v. City of Scranton*, 411 F.3d 118, 128 (3d Cir. 2005).

Although residency requires far fewer contacts than domicile, a bona fide resident still must be more than a transient or sojourner. *See Sochurek*, 300 F.2d at 38. "[M]ere physical presence in a foreign country is not sufficient to establish bona fide residency." *Croyle*, 41 T.C.M. (CCH) 339.

The District Court, at the parties' behest, applied *Sochurek* to this dispute, and we will do so as well. Courts applying *Sochurek* consider the following factors to determine whether a taxpayer's claimed residency is bona fide:

(1) intention of the taxpayer;

---

*Sochurek*, which the parties and the District Court all agreed provides the applicable test, the Seventh Circuit considered the "intention of the taxpayer" as a factor in determining residency, but did not suggest that such intent was a prerequisite. 300 F.2d at 38. Because we conclude that the Ventos had the intent to reside in the Virgin Islands on December 31, 2001, we need not decide whether intent is always required for a taxpayer to prove residency.

21

(2) establishment of his home temporarily in the foreign country for an indefinite period;[11]

(3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment;

(4) physical presence in the foreign country consistent with his employment;

(5) nature, extent and reasons for temporary absences from his temporary foreign home;

(6) assumption of economic burdens and payment of taxes to the foreign country;

(7) status of resident contrasted to that of transient or sojourner;

(8) treatment accorded his income tax status by his employer;

(9) marital status and residence of his family;

(10) nature and duration of his employment; whether his assignment abroad could be

---

[11] Obviously, the Virgin Islands is not a "foreign country," but, as the parties and the District Court agreed, *Sochurek* applies nonetheless. *See Bergersen*, 109 F.3d at 61 (citing *Sochurek* in discussing whether taxpayers were bona fide Puerto Rico residents).

promptly accomplished within a definite or specified time;

(11) good faith in making his trip abroad; whether for purpose of tax evasion.

*Sochurek*, 300 F.2d at 38. "While all such factors may not be present in every situation, those appropriate should be properly considered and weighed." *Id.*

The eleven *Sochurek* factors can be grouped into four broad categories for purposes of our analysis. First, we will consider the taxpayer's intent, which encompasses factors (1), (2), (7), (10), and (11). A taxpayer's intent to remain in a place for an indefinite or at least substantial period of time will support a finding of residency in that place. *See Bergersen v. Comm'r*, 109 F.3d 56, 61 (1st Cir. 1997). This intent can be evidenced by the establishment of a long-term home, a long-term employment assignment, or other evidence indicating an intent to become more than a mere transient or sojourner. *See Sochurek*, 300 F.2d at 38. On the other hand, if a taxpayer has only temporary housing and employment arrangements in the claimed place of residency, and an intent to depart at the end of those arrangements, bona fide residency probably will not be found. *See id.* at 38–39 (discussing "war-worker" cases in which courts have rejected claims of bona fide residency for taxpayers who went abroad "for some specific purpose incident to the war effort," whose employment was "limited by contract or by the duration of the war," and who worked and lived on military bases, where their movements and interactions with the local population were "severely circumscribed"). In addition, a taxpayer's intent to engage in unlawful tax evasion will counsel against a finding of bona fide residency because it indicates that the

23

taxpayer does not in good faith intend to become a resident, but rather intends to perpetrate a sham. *See id.* As we shall discuss in more detail, however, a taxpayer's lawful tax avoidance motives will not weigh against finding bona fide residency.

Second, we consider the taxpayer's physical presence, which encompasses *Sochurek* factors (2), (4), (5), and (7). A taxpayer's sustained physical presence in a place will support a finding of bona fide residency there. *See id.* On the other hand, extensive absences will negate a finding of bona fide residency, unless those absences are justified by good-faith reasons, such as the travel requirements of the taxpayer's profession. *See id.* at 39. In addition to the extent of the taxpayer's physical presence, the nature of that presence is relevant as well. A taxpayer who is present at a home he has established and maintains year-round will have a stronger claim to bona fide residency than one who is present without such a home. *See id.*

Third, we consider the taxpayer's social, family, and professional relationships, which implicate *Sochurek* factors (3) and (9). A taxpayer's claim of bona fide residency will be supported if he assimilates into the locale by building social and professional ties with the local community. *See id.* at 38. The same is true if his spouse and any dependent family members also live there. *See id.* at 38–39. On the other hand, if a taxpayer has not assimilated into the claimed place of residency and maintains most of his social, family, and professional relationships elsewhere, that would counsel against a finding of bona fide residency.

Finally, we consider the taxpayer's own representations, which implicate *Sochurek* factors (6) and (8).

If a taxpayer self-identifies as a resident of a place, by paying taxes there and observing the other economic burdens, civic obligations, and legal formalities of residency, that would support a finding of bona fide residency.[12] On the other hand, a taxpayer who does not self-identify as a resident will have a hard time proving he is one.

C

We review the District Court's factual findings, including its credibility determinations, for clear error. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). Under that standard, we may overturn the District Court's findings only if "we are left with a definite and firm conviction that a mistake has been committed." *Gordon*, 423 F.3d at 201.

We review the District Court's ultimate residency determination de novo because it "is a conclusion of law or at least a determination of a mixed question of law and fact." *Jones v. Comm'r*, 927 F.2d 849, 852 (5th Cir. 1991); *see also Bergersen*, 109 F.3d at 61 (residency determination is "mixed question of fact and law"); *Sochurek*, 300 F.2d at 37 (tax

---

[12] Likewise, if the taxpayer's employer treats him as a resident of a place, that too would support a finding of bona fide residency. *See Sochurek*, 300 F.2d at 38. However, that factor is not implicated here because the Ventos do not have employers.

25

court's "conclusion of residency is reviewable by this court as a question of law").[13]

---

[13] The United States, citing *Bergersen*, argues that the residency question is a mixed question of fact and law and that the District Court's determination is entitled to "some deference." *See Bergersen*, 109 F.3d at 61. Deference to the District Court is appropriate in mixed question cases where answering the question will have little precedential value, where the question does not require much legal reasoning once the applicable test is stated, or where witness credibility is determinative. *See United States v. Brown*, 631 F.3d 638, 643–44 (3d Cir. 2011). In the consolidated cases before us, our decision will likely carry significant precedential value for other taxpayers, particularly other taxpayers who moved to the Virgin Islands prior to 2004. *See McHenry v. Comm'r*, 677 F.3d 214, 215–16 (4th Cir. 2012) (discussing IRS challenges to the residencies of taxpayers who claimed to have moved to the Virgin Islands prior to 2004). In addition, our few disagreements with the District Court are based not on its credibility determinations or factual findings, but rather on its legal analysis—for example, it required more physical presence of the Taxpayers than is appropriate under § 932(c) and placed undue weight on their tax avoidance motivations. Therefore, deference to the District Court is not appropriate in this case. We note that most of the other courts of appeals reviewing tax residency determinations have also reviewed those determinations de novo. *See, e.g.*, *Jones*, 927 F.2d at 852; *Sochurek*, 300 F.2d at 37; *Weible*, 244 F.2d at 161; *Comm'r v. Swent*, 155 F.2d 513, 514 (4th Cir. 1946). *But see Bergersen*, 109 F.3d at 61.

IV

The Taxpayers and the VIBIR raise two broad challenges to the District Court's analysis and several arguments against the District Court's weighing of the evidence. We will first address the global challenges and then weigh the evidence de novo using the *Sochurek* factors.

A

The Taxpayers first argue that, because Congress set a lower bar for proving Virgin Islands residency under 26 U.S.C. § 932 than proving foreign residency generally under 26 U.S.C. § 911, the District Court should have applied a standard more favorable to them in its residency analysis.

It is true that the pre-2004 version of § 932 is easier to satisfy than § 911. Under § 911, a taxpayer seeking to prove foreign residency must prove, "to the satisfaction of the Secretary," that: (1) he was a bona fide resident of a foreign country for the entire taxable year; and (2) that his "tax home" is in that foreign country. 26 U.S.C. § 911(d)(1). By contrast, § 932 merely requires that a taxpayer be a bona fide resident of the Virgin Islands at the end of the taxable year and contains no requirement that a taxpayer's "tax home" be in the Virgin Islands or that the taxpayer prove his case "to the satisfaction of the Secretary." *See id.* § 932(c) (1986).

Consistent with the text of § 932, the Taxpayers need not prove that they were residents of the Virgin Islands for all of 2001 or that they had their tax home in the Virgin Islands. Nonetheless, the Taxpayers still have to prove that they were bona fide residents of the Virgin Islands on December 31, 2001. The fact that § 932 is easier to satisfy than § 911 in

27

three particular respects does not mean that § 932 is not susceptible to analysis pursuant to the *Sochurek* factors. The Taxpayers themselves argued for the application of *Sochurek* in the District Court. We too will follow *Sochurek* and apply the same standard to the Taxpayers' Virgin Islands residency claims as we would apply to any other claim of foreign residency under § 911.

The Taxpayers next argue that the United States should bear the burden of proof. This argument was waived because it was not raised before the District Court. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 645 (3d Cir. 2003).

The Taxpayers and the VIBIR argue that the issue was not waived, pointing to a lone statement by the VIBIR's trial counsel: "I submit that the U.S. had a burden to establish the residence in the U.S. that the Ventos were residing in, and at the latter half of 2001, and they failed to do so." App. 1273. However, because a person can be a resident of more than one place at the same time, *see Downs*, 166 F.2d at 508, the argument that the United States had to show that the Ventos had a specific residence within the mainland is different from the argument that the United States was required to show that the Ventos did not reside in the Virgin Islands. Indeed, the VIBIR's trial briefs seem to acknowledge that the Ventos had the burden of proof. *See* VIBIR Memorandum of Fact and Law on the Issue of Residency at 28, *VI Derivatives, LLC v. United States*, No. 3:06-cv-00012-JRS-RM (D.V.I. May 17, 2010), ECF No. 75 ("The taxpayer must establish that he had an intention to be more than a mere transient or sojourner.").

The Taxpayers also argue that the burden of proof argument was not waived because it was "inherent in the parties' positions throughout th[e] case." *See Huber v.*

28

*Taylor*, 469 F.3d 67, 74–75 (3d Cir. 2006). In *Huber*, we held that the plaintiffs did not waive a choice of law issue because it was "inherent in the parties' positions" when the plaintiffs and the defendants were arguing for the application of the law of different states. *Id.* at 75. In that case, the fact that the parties were arguing for the application of different laws necessarily implied that they were raising a choice of law question. By contrast, the parties' disagreement about the Ventos' residency here does not necessarily imply a disagreement about the burden of proof. *See Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000) (finding burden of proof argument waived).

The Taxpayers also argue that we should exercise our discretion to hear the burden of proof issue because it is a pure question of law. *See Huber*, 469 F.3d at 74–75. We "*may* consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance." *Id.* (emphasis added). Here, the parties are sophisticated and were represented by able counsel. Moreover, the burden of proof issue is immaterial to our ultimate ruling. Therefore, no miscarriage of justice or issue of public importance is implicated and we will not exercise our discretion to adjudicate the issue.[14]

_____

[14] The VIBIR also argues that the District Court violated Federal Rule of Evidence 404(b)(2) by refusing to consider evidence of the Taxpayers' post-2001 activities. But it has failed to cite to a single instance where the District Court sustained an objection to evidence of the Taxpayers' post-2001 activities. Therefore, the VIBIR's Rule 404(b)(2)

29

B

Having rejected the Taxpayers' global challenges to the District Court's analysis, we turn to their arguments against the District Court's weighing of the evidence. We begin by applying the *Sochurek* factors to Richard and Lana Vento.[15]

*1.     Intent*[16]

---

argument is really a challenge to the District Court's weighing of the evidence.

[15] Because 26 U.S.C. § 932(c) applies not only to bona fide residents of the Virgin Islands, but also to individuals filing jointly with bona fide residents of the Virgin Islands, a finding that either Richard or Lana was a bona fide resident authorizes them to file their joint return with the VIBIR in lieu of the IRS. *See* 26 U.S.C. § 932(c)(1)(B).

[16] Intent is ordinarily considered a question of fact, where we defer to the District Court's determination. *See Peterson v. Crown Fin. Corp.*, 661 F.2d 287, 291 (3d Cir. 1981). Here, it is unclear whether the District Court made a factual finding as to the Ventos' intent to become residents. In its discussion section, the District Court opined that "[t]he Ventos' testimony that they intended to become Virgin Islands residents by the end of 2001 is undermined by the objective facts." *VI Derivatives, LLC v. United States*, 2011 WL 703835, at *15 (D.V.I. Feb. 18, 2011). In its findings of fact section, however, the District Court did not mention the Ventos' lack of intent—in fact, it found that "[t]he Ventos had initially hoped the renovations could be completed in

30

The intent to become a resident is not the intent to "make a fixed and permanent home." *Sochurek*, 300 F.2d at 38. Rather, it is the intent to "remain indefinitely or at least for a substantial period" in the new location. *Bergersen*, 109 F.3d at 61. Both Richard and Lana Vento intended to become Virgin Islands residents as of December 31, 2001. That intent is evidenced by their purchase of Estate Frydendahl and their ongoing business interests in the Virgin Islands. And while the Ventos undoubtedly were motivated to live in the Virgin Islands because of its relatively favorable tax system, there is nothing unlawful or deceitful about choosing to reside in a

---

time to move into the main house for Christmas in 2001." *Id.* at \*4. Thus, we read the District Court's opinion as treating intent as an analytical construct rather than a historical fact. Alternatively, even if the District Court's intent determination were read as a determination of fact, its analysis of intent was legally erroneous for the reasons discussed in this section. Therefore, we may reverse it. *See Weible*, 244 F.2d 158 (finding that taxpayer was bona fide resident even though trial court found that taxpayer never intended to become a resident (reversing *Weible v. United States*, 1956 WL 10566 (S.D. Cal. Apr. 6, 1956))); *see also Sochurek*, 300 F.2d at 39 (finding "as a matter of law" that taxpayer was a bona fide resident even though trial court found that taxpayer did not "intend[] to reside there within the scope and intendment of the statute" (reversing *Sochurek v. Comm'r*, 36 T.C. 131, 139 (1961))); *cf. United States v. Lloyd*, 566 F.3d 341, 344 (3d Cir. 2009) (explaining that reliability of hearsay determinations are generally reviewed for abuse of discretion, but are reviewed de novo if the district court's analysis is legally incorrect).

31

state or territory because of its low taxes. Therefore, the District Court erred when it held that those motivations counseled against the Ventos' bona fide residency claims.

First, the Ventos' purchase and renovation of Estate Frydendahl shows that, by the end of 2001, they planned to remain in St. Thomas "at least for a substantial period." Months before the end of 2001, the Ventos purchased Estate Frydendahl for $6.75 million, and began a renovation process that would eventually cost them another $20 million. This substantial outlay, approximately three times the size of the tax controversy in this case, is strong evidence that the Ventos were not purchasing a sham property to avoid paying taxes, but rather that they had a bona fide intent to "remain indefinitely or at least for a substantial period" in the Virgin Islands. *See Bergersen*, 109 F.3d at 61 (finding that taxpayers claiming Puerto Rico residency "clearly" demonstrated the requisite intent because "they embarked on construction of a very expensive house in 1984, before the tax years in dispute" (emphasis omitted)). Indeed, the United States itself argued at trial that the Ventos bought Estate Frydendahl "with the intent of renovating it and using it as a home." App. 575. Although the renovations took longer than expected, that does not defeat the Ventos' intent to move in by the end of 2001. As the District Court found, "[t]he Ventos had initially hoped the renovations could be completed in time to move into the main house for Christmas in 2001." *VI Derivatives, LLC v. United States*, 2011 WL 703835, at *4 (D.V.I. Feb. 18, 2011).

Second, Richard Vento's establishment of business interests in the Virgin Islands supports his claim of bona fide residency. Richard formed three companies in the Virgin Islands in 2001: Virgin Islands Microsystems in May, Edge

32

Access in June, and VI Derivatives, LLC in August.[17] Although VI Derivatives has since been declared an invalid tax shelter, both Virgin Islands Microsystems and Edge Access are bona fide companies with non-tax, business purposes—nanotechnology research and internet access device manufacture, respectively. Richard decided to found the companies in the Virgin Islands to take advantage of the Virgin Islands's Economic Development Program. The process for applying for EDP benefits was "quite lengthy." Ultimately, in 2002, only Virgin Islands Microsystems was approved to receive EDP benefits. Richard also had discussions with the University of the Virgin Islands about collaborating to develop a physics department that would become a source of employees for the companies. Richard's ambitious goals could not have been "promptly" achieved in a "definite or specified time." *See Sochurek*, 300 F.2d at 38. Thus, they support his claim of bona fide residency.

Finally, the Ventos' desire to avoid taxes does not undermine their claims of bona fide residency. Under *Sochurek*, a taxpayer's unlawful "tax evasion" motives can be considered evidence against bona fide residency. *See id.* at 38. However, *Sochurek* did not mention lawful tax

---

[17] The District Court found that these companies were not "up and running by the end of 2001." *VI Derivatives*, 2011 WL 703835, at *15. However, the fact that Richard began establishing these companies—Edge Access was incorporated in the Virgin Islands in June 2001—is probative of his intention to remain in the Virgin Islands long-term, even if the companies were not yet fully operative by the end of 2001.

33

*avoidance*, and the distinction between tax evasion and tax avoidance is a critical one.  *See id.* at 34.

The reason tax evasion motivations are relevant under *Sochurek* is that they are probative of the taxpayer's "good faith in making his trip abroad."  *See id.* at 38.  If a taxpayer does not in good faith intend to change his residency, but rather intends only to dupe the taxing authorities, that intention undermines the taxpayer's claim that his residency is bona fide.  On the other hand, a taxpayer's sincere desire to change his residency in order to take advantage of lawful tax incentives does not undermine his claim of bona fide residency.  If anything, such a motivation would *support* the taxpayer's intent to establish bona fide residency, which is a prerequisite for taking advantage of the lawful tax incentives.

The United States concedes that there is no evidence of tax evasion in this case,[18] but argues that "Richard Vento

---

[18] This concession first appeared in a post-trial brief filed in the District Court that read: "While there is no evidence of tax evasion here, there is undisputed evidence that Richard Vento affirmatively sought to prevent the IRS from learning of his receipt of more than $100 million in income from the sale of OSI stock."  United States Br. 68–69 (quoting United States Proposed Findings of Fact and Conclusions of Law on Residence Issue at 52, *VI Derivatives, LLC v. United States*, No. 3:06-cv-00012-JRS-RM (D.V.I. May 17, 2010), ECF No. 96-1).  On appeal, the United States repeated the concession but then reversed course, citing certain notes that allegedly support a tax evasion motive.  These notes are *dehors* the record, however.  On November 17, 2011, the District Court issued an order stating that the record consisted of documents filed prior to May 16, 2011,

affirmatively sought to prevent the IRS from learning of his receipt of more than $100 million in income from the sale of the OSI stock," which the United States argues is "plainly . . . a tax motivation that is relevant." United States Br. 68–69. In support of its position, the United States cites *Bergersen* and *Croyle* to argue that "tax motivations and activities falling short of 'tax evasion' are relevant" to the residency analysis. *Id.* at 68. However, both cases only weakly support that position.

In *Bergersen*, the First Circuit acknowledged that "[a] tax avoidance motive is often included in the laundry list of factors bearing on bona fide residency, so it is not surprising that the Tax Court mentioned it in passing." 109 F.3d at 62 (citing *Sochurek*, 300 F.2d at 38). In the very next sentence, however, the court stated that "the Bergersens were perfectly free to consider tax advantages in moving their residence to Puerto Rico." *Id.* The court also conducted a harmless error-like analysis:

> The Bergersens imply that the Tax Court erred as a matter of law by giving weight, in deciding the residency issue, to an alleged tax avoidance motive. The Tax Court made one reference to tax avoidance as a relevant concern (the other

and exhibits submitted during the June 2010 bench trial. The notes were submitted on November 7, 2011, in support of a motion for summary judgment in a case involving the Ventos' partnerships on an issue unrelated to the Ventos' residency. Because the notes are not part of the record, we may not consider them. *See Fassett v. Delta Kappa Epsilon (N.Y.)*, 807 F.2d 1150, 1165 (3d Cir. 1986).

reference was to an argument by the government).  But in the very same passage, the Tax Court made clear that it was the time of the move to Puerto Rico, judged by objective factors, that was decisive. We reach the same result, *giving no weight to the alleged motive*.

*Id.* (internal citation omitted and emphasis added).  Thus, contrary to the United States's position, the First Circuit in *Bergersen* expressed doubt as to whether it would be proper to consider tax avoidance motives and upheld the Tax Court's decision while "giving no weight" to the tax avoidance motive.  And while *Croyle* found that tax avoidance motives could be considered in determining whether a taxpayer became a bona fide resident of France, it performed no analysis as to why that was so.  *See* 41 T.C.M. (CCH) 339.

Cutting against the position of the United States is the well-settled proposition that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *see also Weible*, 244 F.2d at 170 ("The income tax law has spread its tentacles into everyone's life, and into every phase of life. . . .  Humble citizen to multi-millioned corporation has the right to assert and take every benefit available.  This without stigma attached.").  In *Gregory v. Helvering*, the Supreme Court noted that if a transaction "in reality was effected within the meaning of [the relevant statute], the ulterior purpose [of tax avoidance] will be disregarded," unless "the transaction upon its face lies outside the plain intent of the statute."  293 U.S. at 469–70.  Thus, under *Gregory*, if a transaction on its face is within the intent of the tax laws—in other words, if the transaction is not a

36

sham devoid of substance, *see Lerman v. Comm'r*, 939 F.2d 44, 45 (3d Cir. 1991)—a taxpayer's legitimate tax avoidance motives should not be held against him.

Here, the District Court found that the Ventos wanted to move to the Virgin Islands so they "would be able to file tax returns with the VIBIR and not the IRS." App. 44. But that is precisely what Congress intended. The purpose of 26 U.S.C. § 932(c) is to "assist the [Virgin] Islands in becoming self-supporting" by "providing for local imposition upon the inhabitants of the Virgin Islands of a territorial income tax, payable directly into the Virgin Islands treasury." *Dudley v. Comm'r*, 258 F.2d 182, 185 (3d Cir. 1958). If a taxpayer decides to move to the Virgin Islands because he would prefer to file his taxes with the VIBIR rather than the IRS, that taxpayer is helping the Virgin Islands become self-supporting, so his move does not "upon its face lie[] outside the plain intent of [§ 932(c)]." *Gregory*, 293 U.S. at 470.

The Ventos certainly decided to move to the Virgin Islands—Richard Vento spent $6.75 million purchasing a property and over $20 million improving it.[19] In addition, he

---

[19] Trial counsel for the United States argued that the Ventos intended to make their home at Estate Frydendahl eventually, and the "real question before the Court" was merely "at what point did they make that residence their home"—with the United States arguing that the point was "sometime in the year 2002," and the Ventos arguing that it was in 2001. App. 575–76. Although the argument of counsel does not conclusively establish the fact that the Ventos desired to make Estate Frydendahl their home, it is probative of the fact that the Ventos' move was not devoid of

founded two legitimate companies in the Virgin Islands. Thus, the Ventos' decision to file taxes with the VIBIR was consistent with the intent of § 932(c). The Ventos were plainly interested in the advantages of filing their taxes with the VIBIR when they decided to move to the Virgin Islands. But using their desire to subject themselves to the mirror code as evidence that they did not intend to comply with it would be both incongruous and contrary to the Congressional scheme.[20]

---

substance and was therefore consistent with the purpose of § 932(c).

[20] This is true even if, as the United States claims, the reason the Ventos wanted to file their taxes with the VIBIR was to reduce the chance that they would be penalized for certain tax shelter transactions. We generally do not consider a taxpayer's reasons for seeking a tax exclusion when evaluating its legitimacy. The United States is essentially asking us to consider how aggressively a jurisdiction applies its tax laws as a factor in determining whether a taxpayer's claimed residency there is bona fide. There is no authority for this proposition. Indeed, the authority is to the contrary. Several federal courts have found taxpayers to be bona fide residents of places where they were subject to no income taxes. *See, e.g.*, *Sochurek*, 300 F.2d at 36, 39; *Scott v. United States*, 432 F.2d 1388, 1397 (Ct. Cl. 1970) ("[I]f one is truly a 'resident' in the ordinary meaning . . . non-subjection to the local income tax will not throw the scale the other way."); *Meals v. United States*, 110 F. Supp. 658, 662 (N.D. Cal. 1953) ("[T]he failure of an American to pay income tax to a foreign country in which he is living is of little significance in

Unlike in *Bergersen*, here the District Court's consideration of the Ventos' tax avoidance motives was not harmless. The Ventos possess significant other indicia of residency. Absent consideration of their tax avoidance motives, those indicia demonstrate that they were bona fide residents of the Virgin Islands at the end of 2001.

*2.    Physical Presence*

Both the extent and nature of the Ventos' physical presence in the Virgin Islands are sufficient to support their claim of bona fide residency. In assessing the amount of time the Ventos spent in the Virgin Islands, we must first note the unique statutory scheme applicable to the Virgin Islands, which serves to distinguish the Ventos' case from other cases in which courts have analyzed how much time a taxpayer spent at a claimed place of residence. *See, e.g.*, *Bergersen*, 109 F.3d at 61–62 (taxpayers were not bona fide residents of Puerto Rico under 26 U.S.C. § 933 when they spent 93 days there compared to 138 days in Illinois); *Johansson*, 336 F.2d at 812 (taxpayer was not bona fide resident of Switzerland under 26 U.S.C. § 911 when he spent only 79 days there, compared to 120 days in Sweden and 218 in the United States); *Sochurek*, 300 F.2d at 36 (taxpayer was bona fide resident of Singapore under § 911 even though he spent only 25 days a year there because he maintained his home in Singapore for the whole year and his absences "were solely in pursuit of his broad professional assignments," *id.* at 39).

_____

determining whether he is a bona fide resident there."); *Rose v. Comm'r*, 16 T.C. 232, 238 (1951).

39

Both § 933, the statute governing Puerto Rico residency at issue in *Bergersen*, and § 911, the statute governing foreign residency generally at issue in *Johansson* and *Sochurek*, require that a taxpayer show that he had a bona fide foreign residency for an "entire taxable year." 26 U.S.C. § 933(1); *id.* § 911(d)(1)(A). In fact, § 911 is even stricter because it requires that a taxpayer be a bona fide foreign resident for "an uninterrupted period which includes an entire taxable year." *Id.* § 911(d)(1)(A).

In stark contrast to those statutes, the version of § 932 applicable to these appeals requires merely that a taxpayer be "a bona fide resident of the Virgin Islands at the close of the taxable year." *Id.* § 932(c)(1)(A) (1986). Under the terms of § 932, a taxpayer can take advantage of its provisions even if he became a bona fide resident of the Virgin Islands only on the last day of the taxable year. Therefore, the Ventos' presence or lack thereof in the Virgin Islands in the first part of 2001 sheds little light on their eligibility for § 932(c), which requires only that they be bona fide residents of the Virgin Islands at the end of 2001.

Examining the time period around the end of 2001, the evidence demonstrates that the Ventos had a sufficient physical presence in the Virgin Islands to support their claim of bona fide residency. According to credit card records, Lana was present in the Virgin Islands for more than half of the days in December 2001, and Richard appears to have been there for the whole month of December 2001. Thus, in light of § 932's mandate that we examine a taxpayer's status as of the end of the taxable year, we find that the Ventos had a sufficient physical presence in the Virgin Islands to weigh somewhat in favor of finding residency.

40

It is true that the Ventos were away from the Virgin Islands for much of late 2001 and early 2002. But substantial absences by themselves will not weigh against a taxpayer unless the "nature" and "reasons" for those absences suggest that the taxpayer's claimed residence was not bona fide. In *Sochurek*, the Seventh Circuit implied that this factor did not weigh against a taxpayer who spent only twenty-five days a year in his claimed residency of Singapore when "his absences from his temporary home were solely in pursuit of his broad professional assignments." 300 F.2d at 39. The taxpayer in that case was a foreign correspondent whose occupation "required him to travel extensively within his area of operations" to places "from [Taiwan] to Indonesia." *Id.* at 36. Because the taxpayer had legitimate reasons for his absences, he was still deemed a bona fide resident of Singapore despite being away for over 90% of the year. *See id.* at 39.

Here, the Ventos' absences from the Virgin Islands, while substantial, are not suspicious because they are consistent with their highly mobile lifestyle. A person may have multiple legal residences at the same time. *See Downs*, 166 F.2d at 508; *see also Hill*, 411 F.3d at 128. Because the Ventos owned homes in Nevada, Utah, California, and Hawaii, in addition to Estate Frydendahl, they could not have spent a majority of the year in each place. They traveled constantly among those places and elsewhere—credit card records show that between August 15, 2001 and November 7, 2001, Richard paid for lodging in California, Hawaii, Florida, Arizona, and Texas. During that time, he also made purchases in Maryland, Nevada, Virginia, California, Hawaii, and Utah. Similarly, between August 18, 2001 and October

41

30, 2001, Lana made purchases in California, Hawaii, Nevada, and Italy.

In fact, the Ventos spent more time at Estate Frydendahl than they did at many of their other homes. The District Court found that, for the first five months of 2002, Richard spent 35 days in St. Thomas, 23 days in San Francisco, and 41 days in Nevada. Adding December 2001 into that calculation means that Richard spent more time in the Virgin Islands than in Nevada for the months surrounding December 31, 2001. Yet Richard was undoubtedly a bona fide resident of Nevada during that time.

Although the foreign correspondent's travels in *Sochurek* were required by his occupation, we see no reason to exalt travel for employment over other kinds of travel. Like the taxpayer in *Sochurek*, the Ventos had a consistent pattern of and explanation for their travel, which tends to negate the claim that their residency is a sham. Thus, the Ventos' absences from the Virgin Islands, while substantial, weigh little, if at all, against their bona fide residency claims.

The nature of the Ventos' presence also supports their claims of bona fide residency because it was more consistent with that of a resident than a sojourner. In May 2001, Richard and Lana contracted to purchase Estate Frydendahl, which was sold furnished, and closing occurred in August 2001.[21] The Ventos lived in Estate Frydendahl for parts of

---

[21] To be sure, Estate Frydendahl was in poor condition and the Ventos wanted to make significant repairs. Richard testified that his wife wanted to remove everything except "the rock walls and the lignum vitae floor" and that they would have to "redo all the rest" of Estate Frydendahl,

2001, including the Christmas Holiday, which they spent with their daughters at the Estate. The District Court found that Richard spent December 2001 and 35 days in the first five months of 2002 in St. Thomas, and there is no evidence that he stayed in a hotel during that time. While the Ventos wanted to make significant improvements to Estate Frydendahl, that desire actually supports their case because it shows that they had the committed physical presence that one would expect from a bona fide resident. *See Sochurek*, 300 F.2d at 39 (fact that taxpayer maintained a home in Singapore year-round supported claim of bona fide Singapore residency even though taxpayer was not physically present in Singapore year-round). And although Estate Frydendahl was a work in progress at the end of 2001, it was still more of an established home than those possessed by other taxpayers who have been found to have bona fide residencies. *See, e.g.*, *Swenson v. Thomas*, 164 F.2d 783, 784 (5th Cir. 1947) ("[N]otwithstanding the fact that he established no fixed home in Colombia, or even a settled place of abode . . . it remains true that he was always living in Colombia, attending to his business there; and that we think constitutes residence there.").

---

including the "roof, . . . air conditioning, electricity, plumbing. Everything." App. 694. Although Estate Frydendahl was in poor condition, it was not unlivable, and the District Court's finding to the contrary was clear error. The seller, Patti Birch, was living at Estate Frydendahl at the time it was sold to the Ventos. In addition, "two gentlemen from New York" and Birch's caretaker also lived on the property. Simply stated, Estate Frydendahl was not unlivable in 2001 because people were living there.

*3.    Relationships*

At the end of 2001, the Ventos' social ties to the Virgin Islands were limited.  The District Court found that "there is no evidence to show [the Ventos] were involved in community activities in the Virgin Islands or had 'assimilat[ed]' into the islands' culture; Richard testified the family joined the St. Thomas Yacht Club, but they did not become members until 2002."  *VI Derivatives*, 2011 WL 703835, at *15.  The District Court reasoned that "[t]he lack of community involvement during 2001 is unsurprising, given that Richard and Lana were rarely present in St. Thomas during the year."  *Id.*  This finding was not clearly erroneous.

Richard testified that he threw two parties at Estate Frydendahl—a closing party with the seller Patti Birch and a "football party."  Richard also testified that he participated in a fundraiser for the Yacht Club.  And Nicole Mollison testified that the Ventos went to Friday night dinners at the Yacht Club.  However, the Ventos provided no evidence of their social involvement apart from their own self-interested testimony, which the District Court was free to discredit.  *See Anderson*, 470 U.S. at 573.  This is particularly true because Richard's testimony about the "football party" was vague, because there was no documentation about any of the Yacht Club events, and because the District Court found that Nicole had significant credibility issues.  Therefore, we agree with the District Court that the Ventos' lack of community ties weighs against finding bona fide residency.

However, community social relationships are not the only type of relationships that factor into the residency calculus—professional, marital, and family relationships matter as well.  In those areas, the Ventos have a stronger

44

case. Richard began developing professional relationships in the Virgin Islands by having discussions with the University of the Virgin Islands in order to collaborate on developing a physics department. The Ventos spent a significant amount of time with each other on St. Thomas, where they lived together at Estate Frydendahl. The fact that their adult daughters lived elsewhere is to be expected. Therefore, the Ventos' professional and family relationships do not undermine their claim of bona fide residency. *See Sochurek*, 300 F.2d at 39 (fact that taxpayer "was unmarried with no dependents living elsewhere" suggested that his foreign residency was bona fide).

*4.     Self-Identification*

The Ventos self-identified as residents of the Virgin Islands at the end of 2001 and observed all the legal formalities of residency. Richard and Lana attempted to pay their 2001 income taxes to the VIBIR. In addition, they obtained Virgin Islands driver's licenses and registered to vote there. Accordingly, this factor weighs in favor of finding bona fide residency.

*          *          *

Taken as a whole, the *Sochurek* factors indicate that the Ventos were bona fide residents of the Virgin Islands. By the summer of 2001, they had developed the intention to live in the Virgin Islands "indefinitely or at least for a substantial period," as evidenced by their purchase of and renovation of a home and establishment of business interests. *See Bergersen*, 109 F.3d at 61. They were physically present in the Virgin Islands for much of the period surrounding the end of 2001, and the nature of that presence was more consistent with what

would be expected of a resident as opposed to a sojourner. And although they did not establish many social ties in the community by the end of 2001, they lived together in the Virgin Islands and represented themselves as residents thereof. For these reasons, we hold that the Ventos were bona fide residents of the Virgin Islands on December 31, 2001.

C

Although the District Court erred in holding that Richard and Lana Vento were not bona fide residents of the Virgin Islands as of December 31, 2001, we readily agree with the District Court that none of the Vento daughters was a bona fide resident at that time.

Applying the *Sochurek* factors to Nicole Mollison, it is clear that she did not intend to become a Virgin Islands resident by the end of 2001. Nicole never established a home in the Virgin Islands, even as she hired contractors to remodel her Nevada home in 2000, 2001, and 2002. Nor did she establish a profession in the Virgin Islands—she studied to become a teacher in Nevada and eventually became licensed to teach in Nevada and California, but not in the Virgin Islands. Nicole's only evidence of intent was her own self-serving testimony, which the District Court found not credible because of her "evasive demeanor on cross-examination, her family's continuing ties to Nevada . . . , and the lack of safe and comfortable accommodations for the Mollison family at [Estate Frydendahl]." *See VI Derivatives*, 2011 WL 703835, at *10 n.38. We defer to these credibility determinations, which are the province of the factfinder. *See Anderson*, 470 U.S. at 573.

46

Likewise, Nicole did not have a sufficient physical presence in the Virgin Islands. She visited there only three times during 2001, each time engaging in "tourist activities." Nicole did not move any personal property to St. Thomas and was not even physically present on December 31, 2001, having returned to Nevada the day after Christmas.

Third, Nicole's ties and relationships mostly remained with the mainland. From 2000 until at least 2003, all of Nicole's children attended school in Nevada. Her husband, from whom she was never separated, lived in Nevada and listed a Nevada address on his 2001 tax return.

Finally, Nicole never identified herself as a resident of the Virgin Islands. Although she filed tax returns with the VIBIR in 2001, she never obtained a Virgin Islands driver's license. During her 2003 adoption proceeding, Nicole swore under oath that she was a resident of Nevada, and that she resided there continuously since 1995. Nicole never told the Nevada court or social worker that she had a Virgin Islands residency.

Likewise, Gail Vento was not a bona fide resident of the Virgin Islands at the end of 2001. Gail did not intend to become a Virgin Islands resident by the end of 2001—she did not establish a home in the Virgin Islands by the end of 2001 but rather lived in her own house in Colorado. Gail herself testified that she moved to the Virgin Islands in 2002.

Gail also had a minimal physical presence in the Virgin Islands. She visited St. Thomas only twice in 2001—for the family cruise in March and for the Christmas party, during which she stayed in a bedroom in the main house at Estate Frydendahl and engaged in "tourist-type activities."

She brought no personal property other than clothing to the Virgin Islands. Although Gail was physically present at Estate Frydendahl on December 31, 2001, she was not there as a resident but rather as a vacationer and guest of her parents.

Gail's primary professional and family ties also remained with the mainland—from 1998 until December 2002, she was enrolled as a full-time student at the University of Colorado. Her boyfriend, whom she has since married, also lived with her in Colorado at the end of 2001. Although Gail filed her 2001 tax returns with the VIBIR, she had not, as of December 31, 2001, observed other formalities of residency such as obtaining a Virgin Islands driver's license or registering to vote there.

Like her sisters, Renee was not a bona fide resident of the Virgin Islands at the end of 2001. She visited the Virgin Islands only three times that year—once after she graduated from college, once in September, and once for the Christmas party. Renee stayed at a hotel during her first visit and at Estate Frydendahl during her second and third visits. The only personal property she had in the Virgin Islands were "easily movable items," such as clothing, cameras, and a laptop. Although Renee was physically present at Estate Frydendahl on December 31, 2001, she was there as a vacationer and guest of her parents, not as a resident.

Meanwhile, most of Renee's ties remained with the mainland. From the summer of 2001 until the spring of 2002, Renee was employed in her family's home office in Nevada while living at Lake Tahoe. In January 2002, she applied to a photography school in California, listing her address as a post office box in Nevada. Renee enrolled in the photography

school in 2002 and lived in California. Although she filed her 2001 taxes with the VIBIR, Renee had not obtained a Virgin Islands driver's license, voter registration, or bank account by the end of 2001.

The Taxpayers argue, somewhat in passing, that the residency of the Vento daughters follows that of their parents. They cite no authority for this proposition, and we are unaware of any. In fact, § 932(c) requires that each "individual" taking advantage of the statute either be "a bona fide resident of the Virgin Islands" or "file[] a joint return" with a bona fide Virgin Islands resident. 26 U.S.C. § 932(c). All three adult daughters filed their own tax returns, and none was a dependent of their parents. Because the daughters were not themselves bona fide residents of the Virgin Islands at the end of 2001 and did not file joint tax returns with their parents, their 2001 taxes were due to the United States.

V

For the foregoing reasons, we will reverse the District Court's judgment with respect to Richard and Lana Vento and hold that they were bona fide residents of the Virgin Islands on December 31, 2001. We will affirm the District Court's judgment that Nicole Mollison, Gail Vento, and Renee Vento were not bona fide residents of the Virgin Islands on December 31, 2001.[22]

---

[22] The District Court made no findings with respect to the Vento partnerships. Because those partnerships are pass-through entities, *see Historic Boardwalk Hall*, 694 F.3d at 429 n.1, they do not have residencies separate from their owners.