JOE S. COBB AND JOYCE H. COBB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cobb v. Commissioner
Docket No. 19224-87
United States Tax Court
T.C. Memo 1991-376; 1991 Tax Ct. Memo LEXIS 420; 62 T.C.M. (CCH) 408; T.C.M. (RIA) 91376; August 8, 1991, Filed *420 Decision will be entered under Rule 155. Thomas H. McPeters, for the petitioners. Thomas J. Travers and James G. LeBloch, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: [1]Additions to Tax -- Section Year
Deficiency
6653(a)(1)
6653(1)(2)
6661
1981
$ 2,480 $124.00 *
0
1982
12,592
629.60 *
$ 3,148
Following concessions, [2] the issues for decision are: (1) Whether petitioners erroneously claimed section 911 foreign earned income exclusions on their 1982 and 1983 returns; [3] (2) whether petitioners erroneously deducted certain expenses incurred with regard to an inherited *421 interest in a residence; and (3) whether petitioners are liable for additions to tax pursuant to section 6653(a)(1) and (2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are husband *422 and wife who filed cash basis, joint Federal income tax returns for the years at issue. (Petitioner husband, Joe S. Cobb, will hereinafter be referred to as Mr. Cobb; petitioner wife, Joyce H. Cobb, will hereinafter be referred to as Mrs. Cobb.) Mr. Cobb claimed residence in Japan on the petition that was filed in this case. It is stipulated that Mrs. Cobb resided in Redlands, California, at the time the petition was filed. This case involves two factual questions: (a) Mr. Cobb's asserted residence in Japan, and (b) certain expenses incurred by petitioners with regard to an interest in a residence inherited by Mrs. Cobb. For convenience, we will address each factual pattern separately. (a) Mr. Cobb's Residence
During the period at issue, Mr. Cobb was employed as an airline pilot by International Air Service Company, Ltd. (IASCO). IASCO is a California corporation in the business of employing and furnishing flight crew personnel to domestic and international aircraft operators. Mr. Cobb began working for IASCO in September 1973. In January 1974, Mr. Cobb completed his IASCO training and was assigned to the Japan Air Lines (JAL) base in Anchorage, Alaska. Beginning in *423 the spring of 1974, Mrs. Cobb and the Cobb's two children lived in Anchorage, Alaska. In February 1980, Mr. Cobb was nominated for B-747 upgrade training, which was to be conducted in Tokyo, Japan. He accepted that assignment by signing an IASCO interoffice memorandum, dated February 20, 1980. That memorandum included the following paragraphs: Japan Air Lines has no plans to expand the ANC [Anchorage] B-747 IASCO crew complement and will not guarantee further transfers from TYO [Tokyo]. Therefore, careful thought and planning should be exercised in accepting this assignment. Indicate below, with your signature, you fully realize that acceptance of B-747 upgrade training constitutes a permanent transfer to Tokyo base and commuting TYO/ANC/TYO will not be approved.
On February 26, 1980, Mr. Cobb entered into a further agreement with IASCO, whereby he agreed to complete at least 36 months of assigned duty with JAL. That agreement stated as follows: 1. IASCO agrees to assign to Japan Air Lines (JAL) Captain J. S. Cobb for transition training for B-747 Captain. 2. IASCO and JAL agree to use their best effort to utilize Captain J. S. Cobb as a B-747 Captain in *424 JAL's manning requirements for not less than thirty-six (36) months, unless there occurs a significant change in JAL's business plan effected by economic depression or other unavoidable causes. 3. Captain J. S. Cobb agrees that, if he fails to complete thirty-six (36) months of assigned duty with JAL because of a voluntary resignation or termination for cause, to pay the cost of the training and revenue stamp involved * * * [fn. ref. omitted]
Mr. Cobb held a multiple-journey, 48-month Japanese visa, with a period of stay of 36 months. The visa was sponsored by JAL. Mr. Cobb remained with JAL until his retirement from IASCO in 1989. Throughout this period, Mr. Cobb was administratively assigned to and based at Narita Airport, Japan. Narita Airport is located approximately 43 miles from Tokyo. When he first arrived in Japan in April 1980, Mr. Cobb lived in an apartment. He moved into the Hotel Nikko Narita less than a year later, and remained based there through the years at issue. The Hotel Nikko Narita is located approximately 2 miles from the Narita Airport. Mr. Cobb commuted between the hotel and airport by way of a JAL or hotel shuttle bus service. The Hotel *425 Nikko Narita is owned by JAL. During the years at issue it offered airline pilots a 50-percent discount on rooms. Mr. Cobb stayed at various rooms at the hotel during this period. He would check out of his room before each flight, and check into another upon returning to Japan. He paid a daily room rate. When away, Mr. Cobb left his bags in storage at the hotel. During his tenure in Japan, Mr. Cobb did not become integrated into the Japanese community. He did not read or speak Japanese, and did not extensively participate in Japanese cultural or social activities. He did, however, attend family dinner parties with Japanese friends. Mr. Cobb played golf and tennis in Japan, and was a member of the "Swim Club" and "Sunset Lounge" at the hotel. At trial, Mr. Cobb testified that the nature of Japanese society prevented him from integrating into the Japanese community. He also stated that he could not have afforded to purchase property in Japan, particularly in Tokyo, which was further away from the airport than the Hotel Nikko Narita. During the periods at issue, Mr. Cobb was present in Japan (and/or any other foreign country or countries) for less than 330 full days in any *426 period of 12 consecutive months. His routine was determined by his flight schedule, required layover periods between flights, and the fact that pilots were not allowed to fly more than 80 hours a month. Mr. Cobb flew into and/or out of JAL stations in Tokyo (Narita), New York, Los Angeles, Anchorage, and San Francisco. In April 1981, following Mr. Cobb's transfer to JAL's Japan base, Mrs. Cobb and the children moved to Redlands, California. Among the factors which influenced this move were Mrs. Cobb's health, educational and economic opportunities, and affordability. Redlands is also located within driving distance of the Los Angeles airport. [4] Mr. Cobb would sometimes visit with his family when laid over in Los Angeles, if there was sufficient time. During the periods at issue, Mr. Cobb was a U.S. citizen. He filed both U.S. and Japanese income tax returns for 1981, 1982, and 1983. *427 IASCO automatically withheld Japanese income tax from Mr. Cobb's salary; he paid the following amounts in Japanese income taxes: Year
Amount 1981
$ 19,752
1982
18,893
1983
30,584
Mr. Cobb held U.S.-based credit cards. He used these cards in Japan, in addition to cash obtained at the Tokyo American Express office and at automated teller machines. Petitioners maintained a joint checking account at a Redlands, California, bank. They used their Redlands address for their bank accounts and credit cards. Mr. Cobb's IASCO paychecks were mailed to him either in Redlands or Tokyo. The checks were in dollars. They were all deposited into petitioners' Redlands account. Mr. Cobb also maintained a Japanese bank account, between April and July 1982. He closed that account because it proved inconvenient as compared to American financial alternatives. Mr. Cobb held a State of Alaska driver's license, as well as an international driving permit during the years at issue. In 1980, he registered to vote in Alaska. He did not register to vote in California, and did not vote in the United States during the years at issue. Mr. Cobb was ineligible to vote in Japan. During the *428 years at issue, Mr. Cobb's personal physician and dentist were located in Redlands. His required flight physicals were conducted by a physician recommended by JAL, located in Los Altos, California. Petitioners claimed foreign earned income exclusions on their 1982 and 1983 returns. These exclusions impacted upon their foreign tax credits for those years, parts of which were carried back to 1981. In his notice of deficiency respondent disallowed these exclusions in full. That notice states: "It has been determined that you do not meet the requirements of section 911 of the Internal Revenue Code as a bona fide resident of a foreign country nor do you meet the requirements of section 911 of the Internal Revenue Code regarding physical presence." (b) Expenses Connected with the Property Inherited by Mrs. Cobb
In May 1981 Mrs. Cobb inherited a one-half interest in the former home of her mother, Mrs. Lulu Crowley, who had passed away. The house was located in Amarillo, Texas. Mrs. Cobb took title at the end of July 1981. The house was not emptied of Mrs. Crowley's possessions until the spring of 1982. It was first listed for sale in late May or early June 1982, and sold *429 on July 16, 1982. The house was not rented between May 1981 and July 1982. On their 1982 joint Federal income tax return petitioners deducted $ 1,505 as "section 212 expenses re Texas property." At trial, Mrs. Cobb testified to the effect that these expenses related to maintenance of the house between the dates of her mother's death and the house's sale. To support these deductions, petitioners presented to the Court copies of checks drawn on their joint accounts, as well as a Summary of Accounts relating to the estate of Mrs. Crowley, prepared by Mrs. Cobb. Some of the $ 1,505 represented Mrs. Cobb's pro rata share of fees for utilities, telephone service, insurance, and gardening; other amounts are unaccounted for. Additionally, the checks and Summary of Accounts indicate that some of the amounts were incurred and paid in 1981, not 1982. In his notice of deficiency respondent disallowed $ 2,080 of petitioners' 1982 miscellaneous deductions. This amount included the $ 1,505 claimed with regard to the Texas property. The notice contains the following explanation: "The amounts claimed by you for payments of estate expenses have been disallowed because it has been determined *430 that the payments were not your ordinary and necessary expenses." Respondent also determined that petitioners were liable for additions to tax for negligence or intentional disregard of rules and regulations, pursuant to section 6653(a)(1) and (2). OPINION Issue (1): Foreign Earned Income Exclusion
The first issue for decision is whether petitioners were entitled to claim foreign earned income exclusions on their 1982 and 1983 returns with regard to Mr. Cobb's employment as a pilot. The foreign earned income exclusion is stated in section 911. In order to qualify for that exclusion, a taxpayer must be a "qualified individual." Sec. 911(a). Section 911(d) defines a qualified individual as follows: (1) QUALIFIED INDIVIDUAL. -- The term "qualified individual" means an individual whose tax home is in a foreign country and who is -- (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present *431 in a foreign country or countries during at least 330 full days in such period.
With regard to a taxpayer's "tax home," section 911(d) continues: (3) TAX HOME. -- The term "tax home" means, with respect to any individual, such individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away from home). An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States.
Petitioners bear the burden of proof on these issues. Rule 142(a). [5]
It has been stipulated that Mr. Cobb did not satisfy the section 911(d)(1)(B) "foreign presence" test during the years at issue. As a result, petitioners must prove that Mr. Cobb's tax home was in a foreign country, and that he was a bona fide resident of a foreign country or countries during the periods *432 at issue. Sec. 911(d). The question of "bona fide residence" raises a highly fact-specific issue, which requires case-by-case determination. As we have stated: "Bona fide residence is primarily a question of fact, and it is, therefore, difficult to reconcile the many cases in the area." Dawson v. Commissioner, 59 T.C. 264, 268 (1972) (citations omitted). In Sochurek v. Commissioner, 300 F.2d 34 (7th Cir. 1962), revg. 36 T.C. 131 (1961), the Seventh Circuit articulated the following list of factors considered by courts as bearing on the determination of bona fide foreign residence: (1) intention of the taxpayer; (2) establishment of his home temporarily in the foreign country for an indefinite period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with his employment; (5) nature, extent and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes *433 to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; (11) good faith in making his trip abroad; whether for purpose of tax evasion. [300 F.2d at 38.]
See also secs. 1.911-2(c) and 1.871-2(b), Income Tax Regs. (emphasizing the importance of a person's intentions, status as a resident contrasted with transient or sojourner, and purpose of his or her visit). While all the Sochurek factors may not be present in every case, those appropriate should be properly considered and weighed. Sochurek v. Commissiner, 300 F.2d at 38. Petitioners must meet a heavier-than-normal "strong proof" standard in order to carry their burden to prove bona fide residence under section 911. Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980). Having considered all the facts of this case in light of the Sochurek factors as well as the regulations' *434 directives, we hold that petitioners have carried their burden to prove that Mr. Cobb was a bona fide resident of Japan during the years at issue. While we are mindful of our opinion in Jones v. Commissioner, T.C. Memo 1989-616, revd. and remanded 927 F.2d 849 (5th Cir. 1991), where we held against a taxpayer in a situation similar to the present matter, we consider the present case to be distinguishable from Jones. In fact, it is these distinctions which tip the balance of Sochurek factors in petitioners' favor, and establish Mr. Cobb's bona fide residence in Japan. Both Messrs. Cobb and Jones were under contract to IASCO. Both worked as JAL pilots in Japan. Each lived at the Hotel Nikko Narita, under a similar arrangement. Both paid Japanese income taxes. Both also paid U.S. income taxes, had U.S.-based families, and held other substantial ties to the United States. Neither was integrated into Japanese society, or was present in Japan for sufficient periods to satisfy section 911's foreign presence test. See Jones v. Commissioner, T.C. Memo 1989-616. The two cases differ, however, with regard to the pilots' *435 employment status, and those situations' implications: in the present matter, petitioners presented specific, contemporaneous documentation of Mr. Cobb's permanent transfer to Japan. In fact, the parties stipulated that Mr. Cobb "accepted a permanent transfer" to, and had a " permanent duty assignment" in Japan. The same cannot be said of Jones. On the contrary, Mr. Jones had twice before been transferred out of Japan. We consider this distinction to be material. Lacking any proof of a permanent transfer to Japan, we decided that Mr. Jones had not carried his burden to prove bona fide residence abroad. Jones v. Commissioner, supra. On balance, his status appeared closer to that of a transient or sojourner than that of a resident. See secs. 1.911-2(c) and 1.871-2(b), Income Tax Regs.[6] Petitioners herein have overcome the deficiency that we found in Jones, and thereby tipped the balance of competing Sochurek factors in their favor: Mr. Cobb's documented permanent duty assignment persuades us that his intention was to be a resident of Japan, and that that intention addressed a sufficiently substantial period of time for us to be able to consider him a resident *436 of Japan, rather than merely a transient or sojourner. In light of these facts, in combination with all the other elements of this case, we hold that Mr. Cobb was a bona fide resident of Japan during the years at issue. We next address the "tax home" requirement. As stated, to qualify for the foreign earned income exclusion, petitioners must also prove that Mr. Cobb's tax home was in a foreign country. Sec. 911(d)(1). The term "tax home" is statutorily defined as an individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away from home). An individual's tax home may not be abroad at any time he or she has an *437 abode within the United States. Sec. 911(d)(3). "Home," for purposes of section 162(a)(2), is generally defined as a taxpayer's regular or principal place of business or employment. Sec. 1.911-2(b), Income Tax Regs.; Harrington v. Commissioner, 93 T.C. 297, 307 (1989). Numerous cases have treated flight personnel's base airports as their principal place of business. See, e.g., Folkman v. United States, 615 F.2d 493 (9th Cir. 1980); Lagrone v. Commissioner, T.C. Memo 1988-451, affd. without published opinion 876 F.2d 893 (5th Cir. 1989). While Mr. Cobb flew into and out of various airports, Narita was clearly his base. Accordingly, it was his principal place of business and thus his "tax home" for purposes of section 162(a)(2). Finally, we address the question of whether Mr. Cobb had an abode in the United States during the years at issue. "'Abode' has been variously defined as one's home, habitation, residence, domicile or place of dwelling. * * * Thus, 'abode' has a domestic rather than vocational meaning, and stands in contrast to 'tax home' as defined for purposes of section 162(a)(2)." Lemay v. Commissioner, 837 F.2d 681, 683 (5th Cir. 1988), *438 affirming a Memorandum Opinion of this Court (quoting Bujol v. Commissioner, T.C. Memo 1987-230). We hold that Mr. Cobb did not have an abode in the United States during the years at issue. While he did sometimes visit with his family when laid over in Los Angeles, these occasions were indeed visits, limited by convenience and Mr. Cobb's flight schedule, and in no way converted the Los Angeles area into Mr. Cobb's domicile or place of dwelling. Accordingly, pursuant to section 911(d)(3), Mr. Cobb's tax home was in Japan. Since we have already found that Mr. Cobb was a bona fide resident of Japan during these years, petitioners have carried their burden to prove their entitlement to the foreign earned income exclusions claimed on their 1982 and 1983 returns. We so hold. Issue (2): Section 212 Expenses
The next issue for decision addresses the deductions claimed by petitioners for expenses associated with the Texas property inherited by Mrs. Cobb. On their return, petitioners identified these deductions as section 212 expenses. Section 212 allows deductions of all ordinary and necessary expenses paid or incurred during the taxable year for the production *439 or collection of income, or for the management, conservation, or maintenance of property held for the production of income. Sec. 212(1) and (2). Petitioners bear the burden to prove their entitlement to these deductions. Rule 142(a). We hold that petitioners have not carried their burden on these items. Firstly, we are unpersuaded that the property was held "for the production of income," within the meaning of section 212. Mrs. Cobb took title in late July 1981. The house remained vacant until sold in July 1982. It was not listed for sale until May or June of 1982, and was unrented in the interim. Based on this evidence, we must conclude that the house was not used during this time for any purpose other than to store the personal possessions of Mrs. Crowley, and that it was not held for the production of income. We are also troubled by the sketchy record on these matters, which calls into question the timing of some of these expenses and leaves other amounts unexplained. Under these circumstances, we must reject petitioners' deduction of these items. For similar reasons, we also must reject petitioners' alternative argument that these expenses should be added to their *440 basis in the property for purposes of calculating their gain from its sale: they have simply not substantiated that any of these amounts were capital expenditures, under the provisions of section 263. Petitioners raise one additional argument with regard to these deductions. They contend that the phrasing of respondent's notice of deficiency somehow narrowed the issues with regard to these items so that the only question raised was whether these expenses were properly attributable to petitioners or to Mrs. Cobb's mother's estate. [7] As a result, petitioners' argument continues, the question of deductibility raises a "new issue," for which they did not have an opportunity to adequately prepare. Petitioners cite cases such as Seligman v. Commissioner, 84 T.C. 191 (1985), affd. 796 F.2d 116 (5th Cir. 1986), as support. We must disagree. Notices of deficiency are to be broadly construed, see Munro v. Commissioner, 92 T.C. 71 (1989), and we cannot accept the argument that petitioners were unapprised of the need to provide the most basic substantiation of their deductions. They were not unduly surprised. Compare Seligman v. Commissioner, supra. *441 As a result, this issue was properly before us, and petitioners have correctly been allocated the burden of proof thereon. As stated, they have failed to carry this burden, and we therefore hold for respondent on this issue. Issue (3): Additions to Tax for Negligence
The final issue for decision is whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules or regulations. Respondent determined that petitioners were liable for these additions to tax, pursuant to section 6653(a)(1) and (2), for both 1981 and 1982. To the extent these additions to tax relate to petitioners' foreign earned income exclusions, they obviously must be reduced, since we have found for petitioners on this issue. However, with regard to the section 212 expenses, we are unpersuaded that petitioners exercised the due care and ordinarily prudent caution necessary to avoid the section *442 6653(a) additions. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners had the burden of proof on this issue, Rule 142(a), and failed to carry it. We therefore sustain respondent's determination on this issue. To reflect the foregoing and concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on the part of the underpayment attributable to negligence.↩
2. Respondent conceded a $ 17,658 item with regard to petitioners' 1982 return. Respondent also conceded that petitioners are not liable for the sec. 6661 addition to tax for 1982. In their petition, petitioners contested respondent's disallowance of $ 2,080 of miscellaneous deductions. At trial and on brief, however, petitioners offered evidence and testimony with regard to only $ 1,505 of this amount. We consider the remaining $ 575 to have been conceded by petitioners. ↩
3. While the deficiencies determined in this case are based on petitioners' 1981 and 1982 returns, their 1983 foreign earned income exclusion is involved because it impacts upon a foreign tax credit carryback from 1983 to 1981.↩
4. Redlands is approximately 50 miles east of Los Angeles, and approximately 80 miles from the Los Angeles International Airport.↩
5. The parties appear to agree that Mr. Cobb's pilot's salary was foreign earned income within the meaning of sec. 911(b)↩; no issue is raised with respect thereto.
6. The Fifth Circuit reached a different conclusion on this point. See Jones v. Commissioner, 927 F.2d 849 (5th Cir. 1991), revg. T.C. Memo 1989-616 on this issue. With deference to the Fifth Circuit, we continue to believe that the question of a person's bona fide residence, under sec. 911(d)(1)(A)↩, is a question of fact, not of law.
7. The relevant portion of respondent's notice of deficiency is excerpted in our Findings of Fact, supra↩.