T.C. Memo. 2017-221

UNITED STATES TAX COURT

ROBERT HUDSON AND ELEANOR M. HUDSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28265-14.                          Filed November 8, 2017.

<u>Eric W. Johnson</u>, for petitioners.

<u>Christina L. Cook</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In a notice of deficiency dated October 1, 2014, respondent

determined the following deficiencies and penalties:[1]

--------

[1] Unless otherwise indicated, all section references are to the Internal
Revenue Code of 1986, as amended and in effect for the years in issue.  Rule
references are to the Tax Court Rules of Practice and Procedure.  Amounts are

(continued...)

| [*2] Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2011 | $42,557 | $8,511 |
| 2012 | 10,657 | 2,131 |

Respondent concedes that petitioners are entitled to a home mortgage interest deduction of $26,464 for 2011, as claimed, and of $11,255 for 2012, as corrected.[2] The remaining issues for decision are: (1) whether petitioners are entitled to the section 911 foreign earned income exclusion for the 2011 and 2012 taxable years, (2) whether petitioners are liable for self-employment tax pursuant to section 1401, and (3) whether petitioners are liable for the accuracy-related penalty under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Arizona when they filed their timely petition. Petitioners were married during the taxable years in issue and filed joint Federal income tax returns.

_____

[1](...continued)
rounded to the nearest dollar.

[2] In their pretrial memorandum petitioners admitted erroneously assuming that they were entitled to home mortgage interest deductions on any two of their residences on their 2012 tax return. Under sec. 163(h)(4)(A)(i), however, one of the two residences had to be petitioners' "principal residence". Petitioners paid off the mortgage on their principal residence in 2011.

[*3]  Petitioner Robert Hudson is a retired airline pilot.  Upon graduating from Iowa State University with a degree in distributive studies, Mr. Hudson had enrolled in a pilot training program offered by the Air Force Reserves (Reserves). During his career Mr. Hudson served as a pilot for the Reserves for 8 years and spent 26 years as a commercial airline pilot for Northwest Airlines (Northwest). Mr. Hudson was employed by both the Reserves and Northwest for several years. After his retirement in February 2007 Mr. Hudson was able to collect his pension from Northwest early with no restriction on his ability to work as a pilot for another airline.

After retiring Mr. Hudson sought employment with foreign airlines because of their policies of maintaining the seniority of pilots.  He decided to seek employment with Korean Airlines.  He was required to submit his application to the airline through a recruiting agency.  Mr. Hudson chose to use the recruiting agency Global Airline Pilots (GAP) because it was based in the United States and his pay would be higher.  After GAP forwarded his application to Korean Airlines, Mr. Hudson was invited to interview with Korean Airlines in Seoul, South Korea (Korea).  During his interview process Mr. Hudson was required to pass a simulator ride, complete a physical examination, and interview with Korean

[*4] Airlines' chief pilots and vice president of flight operations. He did not interview with any representatives from GAP.

Mr. Hudson ultimately was offered, and accepted, a position with Korean Airlines. On March 19, 2007, he entered into an agreement with GAP (GAP agreement) that described his employment status as follows: "The Crew Member is an independent contractor and is not an employee or agent of GAP." The GAP agreement further stated that Mr. Hudson's flight base was in Korea. The contract had a term of five years. At the time he began working for Korean Airlines, he expected to work until he reached the mandatory retirement age (then 60), 5-1/2 years in the future. In 2012 he retired before age 60, at the end of his 5-year contract, because of a failed physical examination.

During his first months as a Korean Airlines pilot Mr. Hudson was required to complete a training course at the Korean Airlines facility, complete the Korean Airlines simulator program, and pass a Korean air law exam. He then was issued a Korean pilot's license as a 747-400 captain. While flying with Korean Airlines Mr. Hudson was required to abide by the Korean Airlines policies and procedures as listed in the Korean Airlines employee manual he received.

During his time with Korean Airlines Mr. Hudson was based in Inchon, South Korea. He received an E5 visa and was a registered alien in Korea. He

**[*5]** lived in a Hyatt Hotel owned by Korean Airlines, and Korean Airlines paid for his housing at the hotel. He stored large suitcases of his belongings at the hotel while he was away and would have these belongings brought to his room upon check-in. The hotel had a designated area for Mr. Hudson to cook his meals, although he mostly ate out with friends. His activities included riding a bicycle provided to him by the hotel, using the hotel's golf course and driving range, and exercising. Mr. Hudson would travel to a nearby town if he had a long time off. He learned basic phrases in Korean, such as greetings and terms necessary to order food in restaurants. He had a Korean bank account and had a Korean cell phone for a limited time.

Mr. Hudson flew routes to cities throughout Asia, Europe, and the United States. In addition, under Korean Airlines' layover policy Mr. Hudson's layovers between his working flights outside Korea could last for days at a time. He received 9 days off per month, which Korean Airlines typically gave in blocks, and 24 vacation days per year. Sometimes he would be asked to take flights on his days off, however. Mr. Hudson would request to use his vacation days in the same period as his days off. For his vacation, he had the option of traveling, at no expense to him, to any city where Korean Airlines flew direct. He seldom spent

[*6] his vacation days in Korea.  Instead, Mr. Hudson sought to spend all of his time off (as many as 132 days per year) in the United States during the years in issue.

Petitioners owned three homes in the United States during the taxable years in issue in Apple Valley, Minnesota; Surprise, Arizona; and Chicago, Illinois. Petitioners' primary residence was in Minnesota.  They paid off the mortgage on their primary residence in 2011.  Petitioners had mortgages on the other two homes for both 2011 and 2012.  Petitioner Eleanor Hudson lived in the Minnesota home during the summer and fall months and spent the colder months in Arizona. Mrs. Hudson also traveled to the locations where Mr. Hudson spent his layovers.

Korean Airlines did not pay Mr. Hudson directly.  Rather, Korean Airlines transferred his salary to GAP, which in turn withheld Korean taxes and GAP's fees and then deposited the remainder into Mr. Hudson's U.S. bank account.  He also received per diem allowances which were deposited into his Korean bank account.  Mr. Hudson received an annual Korean tax statement listing him as a "non-resident".  Mr. Hudson did not view himself as a permanent resident of Korea but as a registered alien paying Korean taxes.

Mr. Hudson sought professional advice regarding his relationship with Korean Airlines and his compliance with tax laws.  He hired an attorney to review

**[*7]** the GAP agreement and understood from that attorney that he became an employee of Korean Airlines when he signed that agreement.

To assist him with his tax obligations, Mr. Hudson initially hired a tax return preparer, Rachel Overcash, who was recommended to him by GAP as experienced in preparing returns for American pilots recruited by GAP to fly for Korean Airlines. He excluded his foreign earned income under section 911 for 2007 on the basis of information provided by Ms. Overcash. He later hired a certified public accountant (C.P.A.) in Minnesota, Paul Christiansen, to prepare petitioners' 2011 and 2012 tax returns. With respect to petitioners' home mortgage interest, Mr. Hudson provided Mr. Christiansen with all of the Forms 1098, Mortgage Interest Statement, that they had received for the three homes they owned during the 2011 and 2012 tax years; and Mr. Hudson answered questions in a "brochure" provided to him by Mr. Christiansen. Petitioners' 2011 return claimed a deduction for home mortgage interest paid on the Minnesota and Arizona houses. Petitioners' 2012 return claimed a home mortgage interest deduction relating to the Arizona and Illinois houses.

Mr. Hudson also sought legal advice regarding his eligibility for the foreign earned income exclusion. He completed a questionnaire provided by his counsel. He did not provide the GAP agreement to counsel; nor was he asked to provide it.

**[*8]** In a letter dated January 6, 2011, Mr. Hudson's counsel advised him that he was eligible for the exclusion.

In the notice of deficiency, respondent disallowed petitioners' foreign earned income exclusions for both taxable years because of their failure to establish either bona fide residence or physical presence in a foreign country for the relevant period. Respondent also determined self-employment tax for both taxable years in issue. Additionally, respondent determined that petitioners failed to report $41 of income from a State tax refund they had received from the State of Minnesota in 2012. As petitioners neither disputed this adjustment in the petition or in their pretrial memorandum nor addressed it at trial, this issue is deemed conceded. See Rules 34(b)(4), 149(b). Finally, respondent determined that petitioners were liable for a 20% accuracy-related penalty under section 6662(a) for each year in issue.

OPINION

The taxpayer generally has the burden of proving that the Commissioner's determinations in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof may shift from the taxpayer to the Commissioner in certain circumstances under section 7491(a). Petitioners have not claimed or shown that they meet the requirements of section

**[*9]** 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

## I. Foreign Earned Income Exclusion

We first address respondent's determination that petitioners did not qualify for the foreign earned income exclusion for 2011 and 2012 under section 911. Section 911(a) allows a "qualified individual" to exclude from gross income "foreign earned income". Foreign earned income is "the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual". Sec. 911(b)(1)(A). A qualified individual is defined as "an individual whose tax home is in a foreign country and who is" either a bona fide resident or physically present in the country for a certain time.[3] Sec. 911(d)(1).

### A. Bona Fide Residence

To qualify for the foreign earned income exclusion as a bona fide resident of a foreign country, a taxpayer must offer "strong proof" of bona fide residence in

---

[3] Sec. 911(d)(1)(B) defines a qualified individual as "a citizen or resident of the United States * * * who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period." Petitioners have not argued or presented evidence showing that Mr. Hudson was present in Korea for a period sufficient to satisfy the sec. 911(d)(1)(B) test.

[*10] the foreign country.  Schoneberger v. Commissioner, 74 T.C. 1016, 1024

(1980).  Courts consider a number of factors when determining whether a taxpayer

was a bona fide resident of a foreign country.  Sochurek v. Commissioner, 300

F.2d 34 (7th Cir. 1962), rev'g and remanding 36 T.C. 131 (1961).  These factors

include:

> (1) intention of the taxpayer;
> (2) establishment of his home temporarily in the foreign country for an indefinite period;
> (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment;
> (4) physical presence in the foreign country consistent with his employment;
> (5) nature, extent and reasons for temporary absences from his temporary foreign home;
> (6) assumption of economic burdens and payment of taxes to the foreign country;
> (7) status of resident contrasted to that of transient or sojourner;
> (8) treatment accorded his income status by his employer;
> (9) marital status and residence of his family;
> (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time;
> (11) good faith in making his trip abroad; whether for purpose of tax evasion.

Id. at 38.  While all of these factors may not be present in every case, the

applicable factors should be considered and weighed.  Id.  Below we consider the

pertinent Sochurek factors.

[*11] Petitioners rely on two cases that applied Sochurek to conclude that pilots for foreign airlines were eligible for the section 911 exclusion: Jones v. Commissioner, 927 F.2d 849 (5th Cir. 1991), rev'g T.C. Memo. 1989-616, and Cobb v. Commissioner, T.C. Memo. 1991-376, 62 T.C.M. (CCH) 408 (1991). We agree with petitioners that the outcome here will depend on whether there are meaningful differences between the facts we have found above and those of Cobb and Jones. We recently performed this very analysis in Acone v. Commissioner, T.C. Memo. 2017-162, a case that also involved a Korean Airlines pilot.

In Jones v. Commissioner, 927 F.2d at 850, the taxpayer, Mr. Jones, was an airline pilot who contracted with a domestic corporation that placed him with Japan Air Lines Co., Ltd. (JAL), a foreign airline. Mr. Jones was based in Tokyo, Japan, but spent fewer than 165 nights a year in Japan. Id. at 851. During the tax years in issue Mrs. Jones resided in Anchorage, Alaska, while Mr. Jones was in Japan. Id. Because Anchorage was JAL's only U.S. base and a normal stopover, Mr. Jones was in Anchorage frequently and would stay in petitioners' townhouse when there overnight. Id. at 851-852. In Japan Mr. Jones lived in a hotel where other crew members also lived. Id. at 851. Mr. Jones did not have extensive contact with Japanese culture but often did socialize with coworkers and occasionally drove into Tokyo for dinner and entertainment. Id. at 852.

[*12] Additionally, Mr. Jones would visit a local Japanese doctor for medical attention. Id.

Mr. Jones would leave his personal belongings in hotel storage while he was away. Id. at 851. Unlike domestic airlines, JAL did not allow flight crew to fly for free, so Mr. Jones paid for the trips he took during his time off using discounted tickets. Id. He had a Japanese driver's license but did not maintain a Japanese bank account or Japanese credit cards. Id. Mr. Jones paid Japanese and U.S. income taxes, and his returns were prepared at his expense. Id. He once returned a dividend check intended for Alaska residents explaining he was no longer an Alaska resident. Id.

The U.S. Court of Appeals for the Fifth Circuit applied the Sochurek factors to conclude that Mr. Jones was a bona fide resident of Japan, reversing the Tax Court's holding to the contrary. Jones v. Commissioner, 927 F.2d at 855. The Court of Appeals concluded that he intended to become a resident of Japan as he returned a dividend check to Alaska and intended to remain in Japan until his anticipated retirement (approximately eight years after his transfer to Tokyo). Id. at 851, 854. As the Court of Appeals recognized, "[a] taxpayer's intent plays perhaps the most important part in determining the establishment and maintenance of a foreign residence." Id. at 854 (citing Dawson v. Commissioner, 59 T.C. 264,

**[*13]** 268 (1972)). The court also rejected our analysis concerning the temporary nature of Mr. Jones' housing in a hotel. Id. at 854. As the court stated: "[I]t is not necessary for a taxpayer to establish a fixed, permanent place of abode in order to be a 'resident' of a foreign country." Id. (citing Swenson v. Thomas, 164 F.2d 783, 785 (5th Cir. 1947)). Mr. Jones was away from Japan only when work required or he was on vacation. Id. The court also determined that the fact that his wife did not join him in Japan should not have been held against him for purposes of determining his bona fide residence. Id. at 854-855. The court noted that Mr. Jones was not assimilated into Japanese culture, but it held that the majority of the Sochurek factors favored bona fide residence. Id. at 855.

In Cobb v. Commissioner, 62 T.C.M. (CCH) at 409, the taxpayer, Mr. Cobb, was employed by a domestic air service corporation and was assigned to work for JAL. While initially based in Alaska, Mr. Cobb later was transferred to the Narita Airport base in Japan. Id. He lived in a hotel owned by JAL during the tax years at issue, paying a discounted daily room rate during his stays. Id. He left his bags in hotel storage while he was away. Id. His wife and children lived in California while he was in Japan. Id. at 410. Mr. Cobb would visit his family while he had layovers in California. Id. Mr. Cobb was not integrated into Japanese culture--he did not learn Japanese and did not participate extensively in

[*14] Japanese social activities. Id. at 409. He did, however, join the swim club and play golf and tennis while in Japan. Id. Mr. Cobb paid Japanese income tax. Id. at 410. On these facts, we held that Mr. Cobb was a bona fide resident of Japan. Id. at 412. On the most significant factor, the taxpayer's intent, we found that Mr. Cobb presented documentary evidence that proved his intention was to be a resident of Japan. Id. Further, in evaluating Mr. Cobb's visits to the United States, we recognized that "[w]hile he did sometimes visit with his family when laid over in Los Angeles, these occasions were indeed visits, limited by convenience and Mr. Cobb's flight schedule, and in no way converted the Los Angeles area into Mr. Cobb's domicile or place of dwelling." Id. at 412. Additionally, we considered Mr. Cobb's transfer to Japan permanent, whereas we viewed Mr. Jones' transfer as temporary because Mr. Jones had been transferred from Japan twice before. Id.

We revisited our application of the Sochurek factors to pilots for foreign airlines in Acone v. Commissioner, T.C. Memo. 2017-162. There we concluded that the pilot, Mr. Acone, did not establish a bona fide residence in Korea even though we accepted his testimony that he intended to remain in Korea until he retired. Id. at *16-*17. We found that he was in Korea only when necessary for work and returned to the United States whenever possible. Id. at *17-*18. Over

**[\*15]** the course of the two years before the Court, he spent a total of 333 days in the United States and only 248 days in South Korea. <u>Id.</u> at \*17. We found this to be a critical distinction. <u>Id.</u> at \*17-\*18. We specifically noted that in <u>Jones</u> the taxpayer was away only when business required or he was on vacation and he had returned a dividend check from Alaska; and in <u>Cobb</u> the taxpayer accepted a permanent transfer to Japan and his occasional visits with family on layovers in the United States were limited by convenience and his flight schedule. <u>Id.</u> at \*21-\*22. "By contrast, Mr. Acone always intended to return to the United States; and in the meantime, his time in the United States with his family far exceeded \* \* \* mere 'visits' of 'convenience'". <u>Id.</u> at \*22.

As we did in <u>Acone</u>, we find here that the <u>Sochurek</u> factors weigh against a finding of bona fide residence in Korea. While Mr. Hudson credibly testified that he intended to work for Korean Airlines until his retirement, petitioners have not shown that he intended to be anything more than a transient. Indeed, Mr. Hudson demonstrated that he always intended to return to the United States.

Further, like the pilot in <u>Acone</u>, Mr. Hudson intended to spend all of his time off work during the years at issue in the United States. Mr. Hudson sought to travel to his home in the United States as often as work would allow, in contrast to the visits of convenience described in <u>Cobb</u>. The record before us does not

[*16] specify the number of days Mr. Hudson spent on duty in Korea versus off duty in the United States (unlike the record in <u>Acone</u>), but we are mindful that petitioners bear the burden of proof, and the record before us shows that Mr. Hudson had as many as 132 days off per year and intended to spend these days in the United States. See <u>Vento v. Dir. of V.I. Bureau of Internal Revenue</u>, 715 F.3d 455, 467 (3d Cir. 2013) ("[E]xtensive absences will negate a finding of bona fide residency, unless those absences are justified by good-faith reasons, such as the travel requirements of the taxpayer's profession[.]"). While we recognize the similarities between Mr. Hudson's circumstances and those of the taxpayers in <u>Jones</u> and <u>Cobb</u>, we conclude that Mr. Hudson's limited contacts with Korean culture combined with his extended absences preclude a finding that he was a bona fide resident of Korea.

We find, therefore, that Mr. Hudson was not a bona fide resident of Korea during the years in issue.

B. Tax Home

As we have determined that Mr. Hudson was not a bona fide resident, we need not evaluate whether his "tax home" was in Korea. Sec. 911. Accordingly, we hold that Mr. Hudson was not a "qualified individual" as defined by section 911(d)(1). Petitioners, therefore, are not entitled to exclude Mr. Hudson's income

**[*17]** as a Korean Airlines pilot under the foreign earned income exclusion for the years in issue.

II. Self-Employment Tax

We next must determine whether Mr. Hudson's income is subject to self-employment tax. Section 1401 imposes a percentage tax on self-employment income. Self-employment income is defined as the "net earnings from self-employment derived by an individual * * * during any taxable year". Sec. 1402(b). Net earnings from self-employment are defined as "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". Sec. 1402(a); see sec. 1.1402(a)-1, Income Tax Regs. The self-employment tax does not apply to compensation paid to an employee, however. Sec. 1402(c)(2).

Whether an individual is an employee or an independent contractor is a factual question answered by applying principles of common law. Secs. 1402(d), 3121(d)(2); Simpson v. Commissioner, 64 T.C. 974, 984 (1975). Factors to consider when determining whether an individual worker is an employee or an independent contractor include:

**[*18]**       (1) the degree of control exercised by the principal over the
details of the work;
     (2) which party invests in the facilities used in the work;
     (3) the opportunity of the individual for profit or loss;
     (4) whether or not the principal has the right to discharge the
individual;
     (5) whether the work is part of the principal's regular business;
     (6) the permanency of the relationship; and
     (7) the relationship the parties believe they are creating.

Weber v. Commissioner, 103 T.C. 378, 387 (1994), aff'd, 60 F.3d 1104 (4th Cir.

1995).  All of the facts and circumstances of each case are considered when

making this determination, and no single factor is conclusive.  See Simpson v.

Commissioner, 64 T.C. at 985.  The degree of control is critical.  See Weber v.

Commissioner, 103 T.C. at 387.  An employer-employee relationship exists when

the principal controls the methods to be used in doing the work and controls the

details and means by which the desired result is to be accomplished.  See Ellison

v. Commissioner, 55 T.C. 142, 152-153 (1970).

We hold that Mr. Hudson's proper work classification during the years in

issue was that of an employee.  Korean Airlines exercised considerable control

over his work.  While flying Korean Airlines aircraft, Mr. Hudson was required to

abide by the policies and procedures listed in the employee manual he received

from Korean Airlines.  See, e.g., Weber v. Commissioner, 103 T.C. 378 (finding

that as the taxpayer was bound by rules determined by his principal, the principal

[*19] held sufficient control for the taxpayer to be classified as an employee). Further, Mr. Hudson's schedule, including his vacation and the length of his layovers, was determined by Korean Airlines. See, e.g., Simpson v. Commissioner, 64 T.C. at 985 (finding that the taxpayer's freedom to set his own office hours and take vacations without his principal's approval weighed in favor of treatment as an independent contractor).

We also reject respondent's assertion that the GAP agreement is determinative of Mr. Hudson's work status. Blodgett v. Commissioner, T.C. Memo. 2012-298; Jacobs v. Commissioner, T.C. Memo. 1993-570; sec. 31.3121(d)-1(a)(3), Employment Tax Regs. ("If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as [an] * * * independent contractor[.]").

Accordingly, we hold that Mr. Hudson's proper work classification was that of an employee and petitioners are not liable for self-employment tax on the income Mr. Hudson earned while working as a Korean Airlines pilot.

**[*20]** III.  Section 6662(a) Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or substantial understatement of income tax. "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Sec. 6662(c).  Negligence is strongly indicated where "[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances".  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.  An understatement of income tax is substantial if the amount of the understatement exceeds the greater of 10% of the tax required to be shown for the taxable year or $5,000.  Sec. 6662(d)(1)(A).

With respect to an individual taxpayer's liability for a penalty, section 7491(c) places the burden of production on the Commissioner, requiring the Commissioner to come forward with sufficient evidence indicating that the imposition of a penalty is appropriate.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  The taxpayer then bears the burden of proof as to any defense to the penalty.  Id. at 446-447.  We anticipate that the Rule 155 computations will

**[\*21]** confirm a substantial understatement of income tax exists for the taxable years in issue and, therefore, that respondent has met his burden of production. Sec. 7491(c).

Taxpayers may absolve themselves of liability for a section 6662(a) penalty if they can show reasonable cause for the resulting underpayment and that they acted in good faith. Sec. 6664(c); Higbee v. Commissioner, 116 T.C. at 446-447. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's efforts to assess the proper tax liability. Id. Reliance on professional advice may constitute reasonable cause and good faith if the taxpayer proves, by a preponderance of the evidence, that he "meets each requirement of the following three-prong test: (1) [t]he advisor was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

**[*22]** Petitioners contend that their reliance on professional advice constitutes the reasonable cause and good faith necessary to absolve them of the section 6662(a) accuracy-related penalty. Mr. Hudson testified credibly that they provided to their C.P.A. the information the C.P.A. sought to prepare their returns accurately, including providing information about their outstanding mortgages. Mr. Hudson also consulted counsel to determine his eligibility for the foreign earned income exclusion and provided to counsel the information counsel requested (via a questionnaire) to make that determination. We hold that petitioners' reliance on these professionals was reasonable under these circumstances. Because petitioners have shown that they acted with reasonable cause and in good faith, they are not liable for the section 6662(a) penalty.

We have considered all arguments made and facts presented in reaching our decision, and, to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.